IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NEOGENIX ONCOLOGY, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| PETER GORDON, MINTZ LEVIN COHN | § | Civ. Action No. 14-cv-4427 |
| FERRIS GLOVSKY and POPEO P.C., | § | |
| NIXON PEABODY LLP, DANIEL J. | § | |
| SCHER, HARRY GURWITCH, the Estate of | § | |
| JOHN L. SQUIRE, and JOHN BUCKLEY, | § | |
| not individually but as personal representative | § | JURY DEMANDED |
| of the Estate of BRIAN LEWIS, | § | |
| | § | |
| Defendants. | § | |

## ORIGINAL COMPLAINT

Plaintiff Neogenix Oncology, Inc. ("Neogenix") files this Original Complaint against Defendants Peter Gordon, Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C., Nixon Peabody LLP, Daniel J. Scher, Harry Gurwitch, the Estate of John Squire, and John Buckley, not individually but as personal representative of the Estate of Brian Lewis (collectively, the "Defendants"), and alleges as follows:

## INTRODUCTION

1.      This case is a textbook example of how a few greedy insiders and negligent professionals can take down a company once promising enough to merit 940+ shareholders investing more than $50 million in its potential. Neogenix was a publicly reporting biotechnology company focused on developing genetically engineered cancer treatments. But the hubris of its former CFO and the willingness of certain conflicted insiders and attorneys at two AmLaw 100 firms to turn a blind eye to his misdeeds proved disastrous.

1

2.      Together, breaches of fiduciary duties, legal malpractice, and the accompanying cover-up prompted an SEC investigation and the discovery that those entrusted with securing Neogenix's future had, instead, poisoned it.  Neogenix had, for years at the CFO's direction, paid commissions to individuals and firms for their sales of Neogenix stock, regardless of whether those "finders" were licensed to sell securities.  The SEC and various states forbid such practices, but the CFO, with the knowledge and consent of the company's outside counsel, pursued these faulty methods for years, never explaining to the Board their impropriety or the risks they created.  As a result, the lawyers collected more than $4 million in excessive and unwarranted fees, and the CFO and his cronies enjoyed six-figure (or more) paydays and lavish lifestyles on the company's dime, while leaving Neogenix exposed to as much as $31 million in rescission liability to its investors.

3.      This liability was crippling.  The target of an SEC inquiry and unable to raise additional capital, Neogenix was forced to file for bankruptcy and sell its assets under court supervision.  Neogenix brings this lawsuit to hold those who engineered its downfall accountable.

## PARTIES

4.      Plaintiff Neogenix is a debtor-in-possession, whose chapter 11 bankruptcy case is currently pending the United States Bankruptcy Court for the District of Maryland, Greenbelt Division, under the caption *In re Neogenix Oncology, Inc.*, Case No. 12-23557 (the "Bankruptcy Case").  Prior to the Bankruptcy Case, Neogenix was a Maryland corporation with its headquarters in Great Neck, New York.

5.      Defendant Peter Gordon ("Gordon") is a citizen of the State of Florida who resides at 936 Bear Island Circle, West Palm Beach, Florida 33409.  Mr. Gordon was a New York citizen at all points in time relevant to this Complaint.  He may be served with process at his residence in Florida.

2

6.      Defendant Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. ("Mintz") is a Massachusetts professional corporation.  Mintz may be served with process through its registered agent, Corporation Service Company, 80 State Street Albany, New York 12207-2543.

7.      Defendant Nixon Peabody LLP ("Nixon") is a New York limited liability partnership.  Nixon may be served with at its registered office, 1300 Clinton Square, Rochester, New York 14604.

8.      Defendant Daniel J. Scher ("Scher") is a citizen of the State of New York.  Scher may be served with process at his place of business, Scher & Scher PC, 55 Watermill Lane, #400, Great Neck, New York 11021, or at his residence at 2323 Quentin Road, Brooklyn, New York 11229.

9.      John L. Squire ("Squire"), now deceased, was formerly a citizen of New York.  On information and belief, no personal representative has been appointed for the Estate of John L. Squire.  Neogenix will seek to amend this complaint to add such representative as the real party-in-interest if and/or when that appointment occurs.

10.     Defendant John Buckley ("Buckley") is the personal representative of the Estate of Brian Lewis.  Mr. Lewis, now deceased, was formerly a citizen of the State of New York.  Buckley may be served with process at his place of business, Buckley & Gerry LLP, 1767 Front Street, Yorktown Heights, New York 10598.

11.     Defendant Harry Gurwitch ("Gurwitch") is a citizen of the State of Florida who resides at 9595 Collins Avenue, Apt. 507, Surfside, Florida 33154.  He may be served with process at his residence.

3

## JURISDICTION AND VENUE

12.     This Court has original jurisdiction over this matter under 28 U.S.C. § 1334(b) because this action is related to the Bankruptcy Case, a case under chapter 11 of the Bankruptcy Code.

13.     This Court has personal jurisdiction over the Defendants because each was either a domiciliary of the State of New York at the time of the acts, events, and omissions complained of, or through their continuous and systematic contacts with the State of New York, each has purposefully availed himself of the benefits and protections of New York's laws and should reasonably anticipate being haled into court here.

14.     Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Neogenix's claims occurred in this district.

## FACTUAL BACKGROUND

### *The Company*

15.     Cancer kills more people than any other non-infectious disease except cardiovascular disease.  Approximately 25 million people in North America, Europe, and Japan have cancer.  Nearly 11 million new cases are diagnosed each year, and by 2020, that number is expected to rise to 15 million.  Deaths from cancer are projected to continue rising, with an estimated 9 million people dying from cancer in 2015 and 11.4 million dying from cancer in 2030.  Neogenix was created to curb this trend and save lives.

16.     Neogenix began in December 2003 as the brainchild of Dr. Myron Arlen, a world-renowned surgical oncologist.  Before its downfall, Neogenix was a biotechnology company that developed therapeutic and diagnostic products for the early detection and treatment of cancers.  Utilizing genetic engineering, Neogenix identified biomarkers to pre-select therapy-specific

4

patients for better clinical trial design and patient response. And while its initial focus was on pancreatic and colorectal cancers, its approach and portfolio of unique monoclonal antibodies held potential for novel and targeted therapeutics and diagnostics for broader treatment through detecting and targeting tumors with minimal destruction to healthy cells.

17.     Although founded in 2003, Neogenix's foundation traces back more than 40 years. In the 1970s and 1980s, Dr. Arlen and Dr. Ariel Hollinshead, a pioneer scientist in tumor immunology at George Washington University Medical Center in Washington, D.C., along with other collaborators, isolated immunogenic tumor associated antigens ("TAAs") from a variety of cancer patients. Data from clinical trials involving those TAAs were indicative of anti-tumor responses and increased survival for patients with cancer. Plus, the trials involving these TAAs showed no measurable adverse effects on the patients. The results of these tests were published in leading, peer-reviewed medical journals in the United States and Canada.

18.     Dr. Arlen and later Neogenix acquired these TAAs and procedures from Dr. Hollinshead and founded Neogenix with the goals of (a) developing in vitro diagnostic products derived from monoclonal antibodies to identify cancer-specific TAAs at an early stage, and (b) developing therapeutic products to attack tumors of such cancers. To that end, Dr. Arlen focused Neogenix on developing novel diagnostic and therapeutic products for the treatment of lung, pancreatic, colon, prostate, and cervical cancers.

19.     His efforts, and those of co-founder Dr. Andrew Bristol and the other doctors and scientists on the Neogenix team led to the company being awarded the 2007 Frost & Sullivan North America Excellence in Research Award in the field of Cancer Theranostics. To achieve this award, a company must have carried out new and innovative research that has or is expected to bring significant contributions to the industry in terms of adoption, change, and competitive

posture.   The award also recognizes a company's overall research excellence as well as its commitment toward differentiating itself on science-backed services or solutions.   In addition, Neogenix was specifically recognized for its "pioneering efforts toward adopting a novel approach to innovative products that have the remarkable potential to serve both as a diagnostic tool and as a therapeutic agent against a diverse array of cancer indications."

20.     The key was Neogenix's development of its proprietary library of cancer vaccines, antigens, and antibodies, some of which the company had secured patents on in the United States and elsewhere,[1] including for NEO-101 ("Ensituximab"), a monoclonal antibody being developed both as a therapeutic drug candidate for pancreatic and colorectal cancer and as a serum for detection of those cancers.

21.     Coupling its proprietary library with cutting-edge technology uniquely positioned Neogenix to create innovative therapeutics.   Neogenix was developing Ensituximab and its other patents both to detect historically fatal cancers and to treat those cancers successfully through minimally invasive and minimally destructive methods.   In short, because Neogenix had the advantage of proprietary antibodies that target tumors with precision, its products held the promise of opening the door to powerful (and more effective) ways to treat cancers that kill millions of us each year.

22.     Unsurprisingly, these products have a strong market.   Cancer therapeutics currently generate roughly $74 billion in global sales annually, and targeted cancer therapeutics of the type Neogenix was developing represent roughly 50% of those sales and are expected to grow to $57

---

[1] By July 2012, Neogenix had secured the following patents in the United States related to novel molecular aspects of NEO-101, the genes encoding it, and related antibodies:  U.S. Patent No. 7,314,622; U.S. Patent No. 7,763,720; U.S. Patent No. RE39,760; and U.S. Patent No. 7,829,678.  Neogenix has also secured patents in Europe, Japan, Canada, and Australia relating to these same break-throughs.  As of July 2012, Neogenix had roughly a dozen pending patent applications in the United States, Canada, and Europe.

billion in annual global sales by 2016.  Colorectal cancer treatment is an approximately $8 billion market in the United States with an annual incidence rate of 1 in 141,000, and pancreatic cancer treatment is an approximately $2 billion market in the United States with an annual incidence rate of 1 in 44,000.

23.     Neogenix began patient clinical trials in 2009.  Preliminary results of those trials were presented at key scientific conferences across the country.  Neogenix then initiated a Phase 2a clinical trial of its lead therapeutic antibody candidate for advanced pancreatic and colorectal cancers.  This multicenter trial was approved by the institutional review boards at The Johns Hopkins University Hospital and Duke University Medical Center.  And the results of clinical trials using Neogenix's patents and technology were selected for presentations each year at the Annual Meeting of the American Society of Clinical Oncology beginning in 2010.

24.     Neogenix, moveover, had attracted significant financial investments to capitalize on its scientific success and to implement its long-term business plan.  By July 2012, Neogenix had more than 940 shareholders who had invested more than $50 million into the company.  All of this promise and all of this potential, however, was undermined by the greed and cronyism of Neogenix's former Chief Financial Officer and by the failings of the company's professional advisors.

### *The Finder Fee Program*

25.     Peter Gordon, Neogenix's former Chief Financial Officer, instigated the company's downfall.  From the beginning, in his role as CFO, Gordon was charged with the duty of raising capital for Neogenix.

26.     In performing that duty, Gordon implemented a system of raising capital whereby Neogenix paid commissions to anyone who brokered a sale of Neogenix stock (the "Finder Fee

Program"), regardless of whether those persons were registered with the U.S. Securities and Exchange Commission (the "SEC") or applicable state authorities. In other words, the Finder Fee Program financially rewarded both licensed and unlicensed finders who secured investment in the company.

27.     These finders were compensated in cash and in Neogenix stock and stock options. The amount of compensation was calculated as a percentage of the investment secured.

28.     Gordon's efforts to raise capital were successful. By April 30, 2009, Neogenix had raised approximately $32,482,659, including approximately $15,559,900 through a private placement memorandum the prior year.

29.     Here's the rub. Unbeknownst to Neogenix, under Section 15 of the Securities Exchange Act of 1934, it is unlawful for "any broker . . . to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker . . . is registered [with the SEC]." The term "broker" is defined as "any person engaged in the business of effecting transactions in securities for the account of others."

30.     As a result, the SEC bars someone who is not licensed by the SEC, or registered with a licensed broker-dealer, from receiving commissions for an investor's purchase of securities. Conversely, the SEC bars issuers like Neogenix from paying these incentives to these unlicensed individuals or their companies. Compounding this is the fact that, depending on the circumstances, federal and state securities laws can allow investors who purchased securities through (or thanks to) unlicensed, compensated finders to potentially rescind their purchase and receive their invested capital back.

31.     In short, the Finder Fee Program violated securities laws insofar as it compensated unlicensed finders based on their successfully brokering the sale of Neogenix stock. By October

2011, Neogenix had compensated unlicensed finders millions of dollars in commissions for their securing tens of millions of dollars in investment capital. Further, sales procured via unlicensed, compensated finders are potentially voidable. Thus, the lack of proper controls in the Finder Fee Program caused Neogenix to incur as much as $31 million in contingent liabilities—liabilities that could have been avoided entirely had the company: (a) not paid commissions to those unlicensed finders; and/or (b) secured those same investments through licensed brokers.

32.     The Finder Fee Program was created, implemented, and run out of Neogenix's offices in Great Neck, New York. Gordon officed there. The company's bank accounts that received the investments and paid the finder fees were there. The Board required that all raised monies be sent to New York. And the majority of the meetings of Neogenix's board of directors (the "Board") discussing Gordon's attempts to raise capital, including the Finder Fee Program, occurred there. Shareholder meetings occurred in Great Neck, and Neogenix's Business Advisory Board—a committee of executives created to, *inter alia*, review company decisions and policies like the Finder Fee Program—also held its meetings in Great Neck.

### *The Cover-Up*

33.     The tragedy in Neogenix's story is that its downfall could easily have been avoided.

34.     By 2005, Neogenix had sold only $708,000 worth of stock and had incurred finder fees of only $12,850. In preparing to launch a broader capital campaign for the company, the Board instructed Gordon to seek advice from Mintz, the company's outside general counsel at the time, regarding the propriety of Neogenix's proposed private placement memorandum ("PPM"). Gordon did so on April 5, 2005, asking Mintz to review and comment on a rough draft of that PPM, which described, among other things, the Finder Fee Program.

9

35.      On April 11, 2005, a Mintz shareholder notified Gordon of the impropriety of the

Finder Fee Program. Writing to Gordon in New York, the attorney explained:

> Your draft provides for the payment of commissions to officers and
> employees who sell units. **You cannot pay compensation to non-licensed
> intermediaries.**

This was a correct statement of the law. Samuel Feigin, the Mintz shareholder responsible for the

Neogenix engagement and relationship, was copied on this correspondence.

36.      Gordon and Feigin ignored this recognition of the improprieties in the Finder Fee

Program, resulting in Gordon violating his duties as CFO and Feigin committing malpractice.

Therefore, the PPM continued to provide for the payment of 10% commissions and finder fees,

and the Finder Fee Program itself went unchanged. Gordon continued to press the Finder Fee

Program and vaunt its success at subsequent Board meetings in New York, while never disclosing

to Neogenix's other officers and directors the contrary information that he had received from the

company's outside counsel. Feigin followed suit, never disclosing this information, or the fact

that Gordon had been told that Neogenix could not compensate unlicensed finders, to the

company's other officers or directors. On information and belief, no other Mintz attorney did

either. It was malpractice for Feigin, the Mintz shareholder responsible for the engagement and

for Mintz's relationship with Neogenix, to keep this information from the company and to fail to

implement restrictions on the company's Finder Fee Program in-line with Mintz's conclusions.

Mintz was responsible for these failures by Feigin.

37.      One of the explicit requirements of Mintz's engagement was to participate in Board

meetings, document Board actions, and advise the Board on general corporate matters as well as

specific issues relating to offerings, financing, and negotiations. The purpose of Neogenix having

Mintz attorneys participate in Board meetings was to provide counsel to the Board. Neogenix did

not have in-house counsel until 2010, so from August 2004 to that point, outside counsel was the Board's sole source of legal advice.

38.     As Neogenix's sole corporate counsel during this period, Mintz advised Neogenix on all of its fundraising efforts and its payment of commissions to unlicensed finders, and Neogenix looked solely to Mintz for this advice. As a result, Mintz attorneys knew that the Finder Fee Program violated securities laws and knew that their silence, in general, and at Board meetings, in particular, regarding the Finder Fee Program and Gordon's concealment of Mintz's recognition of the Finder Fee Program's improprieties would be viewed by Neogenix as blessing both the program and Gordon's conduct. And Mintz should have expected such reliance, given that its website assured clients like Neogenix that Mintz "has a long tradition of acting as a trusted advisor" to "those sole proprietors [and] joint ventures . . . who need comprehensive, experienced business counsel."

39.     Feigin began attending Board meetings in October 2004, and he was at the first Board meeting after his firm had recognized the impropriety of compensating unlicensed finders. During this meeting on May 21, 2005, Gordon discussed his fundraising efforts, including the payment of finder fees and the upcoming PPM. Gordon, however, made no mention of (a) the impropriety of compensating unlicensed finders or (b) Mintz's recognition of that impropriety. Feigin, despite receiving the memorandum acknowledging the Finder Fee Program's improprieties and knowing that compensating unlicensed finders violated securities laws, listened to Gordon's report but failed to mention that memorandum or otherwise advise the Board or Neogenix's officers of the improprieties associated with the Finder Fee Program. Further, as part of the Board books that Gordon prepared and Mintz reviewed for subsequent Board meetings, Gordon would

11

include information disclosing the finder fees that had been paid or incurred and would often specifically reference these fees or their amounts in his presentations.

40.     Any lawyer exercising that degree of care, skill, and diligence commonly possessed and exercised by members of the legal community would have known that it was at least negligent for Mintz to participate in Board meetings and charge for its participation, but choose not to inform the Board that Mintz had long since concluded that the Finder Fee Program violated securities laws. Further, any lawyer exercising that degree of care, skill, and diligence commonly possessed and exercised by members of the legal community would have known that it was at least negligent for Mintz to know that Neogenix's CFO was concealing material, adverse information from his fellow officers and directors, yet withhold that fact from its client. Nevertheless, Mintz's deliberate silence continued, in violation of the standard of care and ethical and fiduciary duties, and the Board was kept in the dark.

41.     Feigin attended the next Board meeting on August 6, 2005, which occurred in New York. As before, Gordon updated the Board as to his fundraising efforts, and again, the Finder Fee Program and the PPM that Mintz had determined violated securities laws was discussed. But neither the impropriety of the Finder Fee Program nor Mintz's recognition of that impropriety was raised, and Feigin again remained silent in spite of his duty to speak. Ignorant of Mintz's recognition of the impropriety of paying commissions to unlicensed finders and Gordon's concealment of that recognition, the Board that day specifically authorized the payment of finder fees to an unlicensed company, American Southern Financial Group, LLC. Similarly, each time a fundraising period would end—and sometimes while those periods were still open—Gordon would update the Board regarding the commissions owed to unlicensed finders and the identities of those finders, and the Board would authorize or otherwise ratify those commissions.

12

42.     At the Board meeting on November 5, 2005, Gordon again addressed the PPM and his general fundraising efforts.  But as before, he failed to disclose Mintz's recognition of the Finder Fee Program's impropriety.  This concealment continued at the special meeting of the Board convened on December 1, 2005.  Gordon again discussed matters relating to the PPM and the payment of finder fees but never disclosed the risks that paying those fees created or Mintz's recognition of those risks.

43.     During 2005, Neogenix sold almost 1.7 million shares of stock for more than $2.2 million.  It incurred finder fees of $60,101 related to these sales and paid a portion of that compensation through awarding the finders 6,375 shares of common stock.  In just a year, Neogenix's finder fee costs had increased five-fold.

44.     The negligent failure to advise the company persisted.  On February 3, 2006, the Board held a meeting attended by Gordon, Feigin, and another Mintz shareholder named Mark Kass ("Kass").  Like Gordon and Feigin, Kass knew or should have known that it was improper to pay commissions to unlicensed finders, and he knew or should have known that Mintz's conclusion in this regard had been relayed to Gordon.  But like Gordon and Feigin, Kass never notified the Board or Gordon's fellow officers of these facts.

45.     At the February 3rd Board meeting, Gordon provided materials to the Board that disclosed the amount of commissions incurred and made a presentation concerning those commissions, as well as his fundraising efforts and the current PPM.  But, as before, Gordon made no mention of the impropriety of paying commissions to unlicensed finders or Mintz's recognition of that impropriety from the prior year.  Even while Gordon discussed Neogenix paying commissions, neither Feigin nor Kass raised Mintz's recognition of the impropriety of paying

commissions to unlicensed finders or implied anything different than legal approval for all facets of the Finder Fee Program.

46.     Kass next attended a Board meeting on November 18, 2006.  Gordon was also there and made another presentation regarding his fundraising efforts and the PPM.  Included in that presentation was an update on the amount of commissions to finders.  Neither Gordon nor Kass discussed the impropriety of paying commissions to unlicensed finders or Mintz's recognition of that impropriety.

47.     This practice continued—Feigin and/or Kass regularly attending Board meetings in New York on behalf of Mintz, where Gordon updated the Board on his fundraising efforts tied to the Finder Fee Program and the company's payment of commissions to finders—on April 21, 2007, November 10, 2007, May 17, 2008, and August 9, 2008.  Kass or Feigin also had additional meetings with Neogenix personnel in New York, such as one that occurred on August 29, 2007.  On none of those occasions did Gordon, Feigin, Kass, or anyone from Mintz advise the Board of (a) the impropriety of paying commissions to unlicensed finders, (b) the potential rescission liability that accompanied that practice, or (c) the fact that Mintz had recognized that impropriety and that Gordon was concealing that recognition from his fellow officers and directors.

48.     In addition to attending Board meetings, Feigin and Kass also made presentations to the Board at certain of those meetings.  Implicit in such events is the fact that Feigin and Kass chose when to speak up at Board meetings and when to remain silent.  Kass, for example, made a presentation to the Board on November 10, 2007, where he advised them to discard or destroy all hand-written notes, drafts, and Board books between meetings.  This enabled the minutes that he and Feigin reviewed and edited to be the only records of those meetings.  In other words, given Mintz's (1) role and influence as Neogenix's sole corporate counsel, (2) knowledge both that the

14

Finder Fee Program risked rescission liability for the company and that it had recognized the impropriety of the Finder Fee Program in a memorandum to the CFO but the CFO was concealing that recognition in breach of his fiduciary duties, and (3) practice of addressing the Board on any issue it deemed fit, Feigin and Kass knew or should have known that Neogenix would rely on their deliberate silence concerning the Finder Fee Program's improprieties and Gordon's concealment and would see it as active approval of the Finder Fee Program and Gordon's conduct as CFO.

49.     In addition to the eight Board meetings Feigin or Kass attended where PPMs and the compensation of finders were discussed, Mintz had many other opportunities to notify Neogenix of the improprieties associated with paying commissions to unlicensed finders and the risks that the Finder Fee Program created for Neogenix.  For example, Mintz was Neogenix's sole source of legal advice regarding capital raises, and Mintz drafted each of the three PPMs (dated October 2, 2005; May 1, 2007; and June 15, 2008) issued between April 2005 and when Mintz's engagement ended.  Each PPM basically regurgitated its predecessor, albeit updating the number of shares offered, the price, company developments, and risk factors.  And all discussed the Finder Fee Program without disclosing its impropriety or the risks it created for Neogenix.  But these PPMs remained open for indefinite periods of time, and Mintz attorneys regularly worked on matters related to those PPMs, prepared updates for the Board, or worked on related capitalization issues on 40 days in 2005, 41 days in 2006, 54 days in 2007, and 110 days in 2008, sometimes with multiple Mintz attorneys billing each day.

50.     Specifically, Mintz's records show that at least one of its attorneys worked on PPMs or stock-related matters for Neogenix or otherwise prepared materials for or directly communicated with Board members on at least the following occasions during 2005:

- 18 days in September 2005;
- 4 days in October 2005;

15

- 10 days in November 2005; and
- 8 days in December 2005.[2]

51.     During 2006, one or more Mintz attorneys worked on PPMs or related issues or communicated with Neogenix officers or directors regarding such issues on at least the following occasions:

- 8 days in January 2006;
- 6 days in February 2006;
- 1 day in March 2006;
- 2 days in April 2006;
- 2 days in May 2006;
- 7 days in June 2006;
- 2 days in July 2006;
- 5 days in August 2006;
- 5 days in September 2006;
- 2 days in November 2006; and
- 1 day in December 2006.[3]

52.     During 2007, one or more Mintz attorneys worked on PPMs or related issues or communicated with Neogenix officers or directors regarding such issues on at least the following occasions:

- 1 day in January 2007;
- 1 day in March 2007;
- 15 days in April 2007;
- 6 days in May 2007;
- 6 days in June 2007;

---

[2] Not accounting for unrecorded time, unrecorded work, or vague time entries, the particular days are as follows: September 6-9, 13-16, 19-23, and 26-29; October 7, 10, 11, and 25; November 3, 4, 7-11, 18, 21, and 22; and December 1, 12, 13, 16-19, 20, and 22. On any of these days, the Mintz attorney performing the work could have picked up the phone, sent correspondence, or interjected into the meeting or conversation to alert Neogenix that the Finder Fee Program was improper or that Mintz had recognized that impropriety months before, that Gordon was aware of that recognition, and that he was concealing that information from his fellow officers and directors.

[3] Not accounting for unrecorded time, unrecorded work, or vague time entries, the particular days in 2006 are as follows: January 3-5, 23, 25-26, 30, and 31; February 1-3, 14, 17, and 22; March 28; April 3 and 10; May 3 and 11; June 6, 16, 19-22, and 23; July 10 and 24; August 2-4, 30, and 31; September 12-15, and 22; November 17 and 18; and December 18. Again, on any of these days, the Mintz attorney performing the work could have picked up the phone, sent correspondence, or interjected into the meeting or conversation to alert Neogenix that the Finder Fee Program was improper or that Mintz had recognized that impropriety the prior year, that Gordon was aware of that recognition, and that he was concealing that information from his fellow officers and directors.

- 2 days in July 2007;
- 6 days in August 2007;
- 3 days in September 2007;
- 1 day in October 2007;
- 5 days in November 2007; and
- 8 days in December 2007.[4]

53.    And in 2008, before its engagement ended, Mintz attorneys addressed PPM or

related issues or communicated with Neogenix officers or directors on at least the following

occasions:

- 12 days in January 2008;
- 13 days in February 2008;
- 25 days in March 2008;
- 19 days in April 2008;
- 7 days in May 2008;
- 13 days in June 2008;
- 5 days in July 2008;
- 11 days in August 2008;
- 1 day in September 2008; and
- 4 days in October 2008.[5]

54.    Despite at least eight Mintz attorneys spending portions of at least 245 days

focusing on Neogenix's PPMs and capitalization issues or communicating with members of the

Board, at no point did Mintz inform any other Neogenix officer or director that the company was

not permitted to pay commissions to unlicensed finders or that Mintz had informed Gordon of that

---

[4] Not accounting for unrecorded time, unrecorded work, or vague time entries, the particular days in 2007 are as follows: January 11; March 22; April 4, 10-12, 17, 18, 20, 21, 23-27, 29, and 30; May 1-4, 16, and 21; June 7, 11, 14, 21, 18, and 19; July 24 and 27; August 2, 15, 19, 27-29; September 7, 20, and 21; October 29; November 8-10, 27, and 28; and December 3-5, 14, 21, and 26-28. On any of these days, the Mintz attorney performing the work could have picked up the phone, sent correspondence, or interjected into the meeting or conversation to alert Neogenix that the Finder Fee Program was improper or that Mintz had recognized that impropriety two years before, that Gordon was aware of that recognition, and that he was concealing that information from his fellow officers and directors.

[5] Not accounting for unrecorded time, unrecorded work, or vague time entries, the particular days in 2008 are as follows: January 2, 7, 9, 14-18, 22, and 24-26; February 1, 3-5, 7, 8, 10-12, 14, 21, 25, and 26; March 2, 3, 5, and 7-28; April 2-4, 6, 7, 9-11, 14-16, 18, 21, 22, 24, 25, and 28-30; May 5, 15-17, 23, 29, and 30; June 2-6, 9, 17, 19, 20, 23, 24, 27, and 30; July 1, 7, 8, 14, and 25; August 4-9, 11, 12, 14, 15, and 16; September 10; and October 2, 7, 10, and 17. On any of these days, the Mintz attorney performing the work could have picked up the phone, sent correspondence, or interjected into the meeting or conversation to alert Neogenix that the Finder Fee Program was improper or that Mintz had recognized that impropriety three years before, that Gordon was aware of that recognition, and that he was concealing that information from his fellow officers and directors.

fact back in April 2005. Mintz intended to and succeeded in keeping Neogenix in the dark to keep the work (and the fees) coming in. The entire period that Mintz served as Neogenix's outside corporate counsel, the company reasonably and justifiably relied on Mintz's silence to believe that the firm and its lawyers approved the Finder Fee Program and blessed the payment of commissions to unlicensed finders. Neogenix was also induced by Mintz's silence into reasonably believing that Gordon had no reason to suspect that the Finder Fee Program was improper.

55.     The cover-up continued when Feigin and Kass left Mintz for Nixon in late 2008. As Feigin and Kass had been performing "all of the Company's corporate and employment work" to that point, Feigin asked his long-time client to come with him when he left. Neogenix agreed.

56.     Writing to Gordon in New York, Feigin explained that he had left Mintz, effective November 10, 2008, and joined Nixon. In that letter, Feigin invited Gordon to allow him "to continue [his] representation of Neogenix" and to authorize the transfer of services from Mintz to Nixon via an enclosed form. That form, which Gordon signed, advised Mintz that Neogenix had "engaged Nixon Peabody LLC to represent" the company. The form directed Mintz to "transfer all of [Neogenix's] files, and related electronic data, including e-mails," to Nixon. On information and belief, this was done.

57.     Thus, Feigin and Kass continued their representation of Neogenix at Nixon, and they continued to advise Neogenix on all corporate, finance, and securities-related matters. Indeed, on January 19, 2009, Feigin and Kass attended a Board meeting whose minutes (as reviewed and edited by Nixon) describe them as "Company outside legal counsel." And as before, Feigin and Kass drafted and advised on the Neogenix PPMs issued on May 4, 2009, January 4, 2010, and July 1, 2010, all of which promised commissions to any finders, regardless of licensing.

58.     As was the case with Mintz, Nixon was the Board's sole source of legal advice until the company hired in-house counsel in early 2010.  And as was true when they were at Mintz, Feigin and Kass knew that the Finder Fee Program violated securities laws and knew that their silence, in general, and at Board meetings, in particular, regarding the improprieties associated with the Finder Fee Program and Gordon's concealment of Mintz's recognition of those improprieties was viewed by Neogenix as Nixon blessing both the program and Gordon's conduct. Indeed, Nixon's website at the time touted its experience in securities law, explaining how its attorneys "listen closely to our clients and work together with them to . . . evaluate risk so that decisions are always well-informed."  Nixon further promised, "Our focus is not on just the immediate transaction, but on our clients' success over the long term."

59.     But Feigin and Kass continued to sit through Board meetings where the Finder Fee Program and payments of commissions to unlicensed finders were discussed without ever advising Neogenix that a Mintz lawyer had recognized years earlier that the payment of those commissions violated securities laws.  Instead, Feigin and Kass and others at Nixon drafted (and blessed) PPMs that contained terms that violated securities laws, and neither they nor anyone else at Nixon advised the Board of the improprieties in the Finder Fee Program.  This, again, was malpractice, and now that Feigin and Kass were partners at Nixon, Nixon was responsible for their breaches of professional care as well as the breaches of other Nixon attorneys who advised the Board or worked on PPMs or other fundraising matters for Neogenix without ever advising Neogenix of the impropriety of the company's paying commissions to unlicensed finders.  Nixon is responsible for these attorneys' malpractice and for overcharging Neogenix for these services as well.

60.     Any lawyer exercising that degree of care, skill, and diligence commonly possessed and exercised by members of the legal community would have known that it was at least negligent

19

for Nixon to participate in Board meetings, prepare PPMs, advise on securities registrations, and charge for these services, but choose not to (1) inform Neogenix that the payment of commissions to unlicensed finders violated securities laws and (2) implement controls to prohibit the payment of such commissions.  Further, any lawyer exercising that degree of care, skill, and diligence commonly possessed and exercised by members of the legal community would have known that it was at least negligent for Nixon (via Feigin and Kass) to know that Neogenix's CFO was concealing material, adverse information from his fellow officers and directors, yet withhold that fact from its client.  Nevertheless, Nixon remained silent when it had a duty to speak in connection with advising the company's officers and directors and preparing PPMs, in violation of the standard of care and ethical and fiduciary duties, and the Board was kept in the dark.

61.     At the January 19, 2009 meeting where Gordon advised the Board regarding the company's fundraising efforts and payment of finder fees, Feigin and Kass said nothing about the impropriety of paying those fees to unlicensed finders.   Feigin and Kass even made a presentation during this meeting. But having taken that opportunity to speak, they did not warn the Board or Gordon's fellow officers about (1) the risks posed by the Finder Fee Program, (2) the fact that their former firm had recognized four years earlier that securities laws prevented Neogenix from paying commissions to unlicensed finders, or (3) the fact that Gordon was concealing that recognition.

62.     Feigin and Kass attended the next Board meeting on April 23, 2009.  At no point during that meeting did they raise the impropriety of paying commissions to unlicensed finders, the risks to Neogenix of doing so, or the fact that Gordon had received a memorandum wherein Mintz recognized those improprieties and was concealing that recognition from his fellow officers and directors.

20

63.     This pattern continued at the Board meetings on May 4, 2009, September 8, 2009, November 6, 2009, February 18, 2010, March 20, 2010, June 16, 2010, September 15, 2010, and February 2, 2011—all which, on information and belief, were held in Great Neck, New York or via teleconference with at least a portion of the Board, including Gordon, convening in the company's offices in Great Neck, New York.  During these Board meetings, Gordon reported on fundraising efforts and the payment of finders' commissions, and Kass answered Board questions or made presentations on various corporate issues, including SEC rules and regulations.  Another Nixon attorney, John Partigan, also made presentations to the Board and answered its questions regarding various SEC and internal control requirements.  The impropriety of paying commissions to unlicensed finders was never discussed or even raised.

64.     In addition to those eight meetings, Kass and Partigan updated the Board on various SEC or other issues on August 11, 2009, January 19, 2010, March 5, 2010, and December 1, 2010.  In fact, on January 19, 2010, Kass's presentation to the Board specifically addressed their duties as directors under Maryland law.  And Nixon attorneys were also present at the Board meetings on April 20, 2010 and December 29, 2010, where Gordon discussed the payment of finder fees in connection with various PPMs that Nixon drafted.  However, no Nixon attorney ever raised the impropriety of Neogenix paying commissions to unlicensed finders or Gordon's concealment of the recognition he received from Mintz regarding that impropriety.

65.     Like Mintz, Nixon had many other opportunities to notify Neogenix of the improprieties associated with paying commissions to unlicensed finders and the risks that the Finder Fee Program created for Neogenix.  Like Mintz before it, Nixon advised Neogenix regarding its efforts to raise capital during its tenure, and Nixon drafted each of the 3 PPMs issued during that time.  Each PPM basically regurgitated its predecessor, with updates to the number of

21

shares offered, the price, company developments, and risk factors. And all discussed the Finder Fee Program without disclosing its impropriety or the risks it created for Neogenix. Plus, these PPMs remained open for indefinite periods of time, and Nixon attorneys regularly worked on matters related to those PPMs, prepared updates for the Board, or worked on related capitalization issues over the course of 15 days in the two months during 2008 that Nixon was Neogenix's attorneys, 237 days in 2009, and 245 days from January 2010 through November 2010, sometimes with multiple Nixon attorneys billing each day. Beginning in December 2010 and again in January 2011, enough Nixon attorneys were working on "capitalization, strategic, financing . . . [and] SEC" matters each day for Neogenix, including work on two Form 8-Ks, to supposedly justify Nixon billing Neogenix $60,000 in legal fees for each of those two months.

66.     Specifically, Nixon's records show that at least one of its attorneys worked on PPMs or stock-related matters for Neogenix or otherwise prepared materials for or directly communicated with Neogenix officers or directors on at least the following occasions during 2008:

- 5 days in November 2008; and
- 10 days in December 2008.[6]

67.     During 2009, one or more Nixon attorneys worked on PPMs or related issues or communicated with Neogenix officers or directors regarding such issues on at least the following occasions:

- 15 days in January 2009;
- 16 days in February 2009;
- 23 days in March 2009;
- 23 days in April 2009;
- 19 days in May 2009;

[6] Not accounting for unrecorded time, unrecorded work, or vague time entries, the particular days are as follows: November 14, 17, 19, 25, and 26 and December 2-5, 9, 11, 12, 14, 29, and 31. On any of these days, the Nixon attorney performing the work could have picked up the phone, sent correspondence, or interjected into the meeting or conversation to alert Neogenix that the Finder Fee Program was improper or that Mintz had recognized that impropriety years ealier, that Gordon was aware of that recognition, and that he was concealing that information from his fellow officers and directors.

- 8 days in June 2009;
- 13 days in July 2009;
- 22 days in August 2009;
- 23 days in September 2009;
- 24 days in October 2009;
- 25 days in November 2009; and
- 26 days in December 2009.[7]

68.     During 2010, one or more Nixon attorneys worked on PPMs or related issues,

including Neogenix's filings with the SEC, or communicated with Neogenix officers or directors

regarding such issues on at least the following occasions:

- 23 days in January 2010;
- 23 days in February 2010;
- 27 days in March 2010;
- 26 days in April 2010;
- 21 days in May 2010;
- 28 days in June 2010;
- 22 days in July 2010;
- 14 days in August 2010;
- 19 days in September 2010;
- 23 days in October 2010; and
- 19 days in November 2010.[8]

---

[7] Not accounting for unrecorded time, unrecorded work, or vague time entries, the particular days are as follows: January 2, 5-8, 12, 14-16, 19, 21, 23, 26, 27, and 29; February 9-13, 16-21, and 23-27; March 1-6, 9, 10, 12, 13, 16-18, 20, and 23-31; April 1-3, 6-10, 13-18, 20-24, and 27-30; May 1-8, 10-15, 18, 21, 22, 26, and 28; June 5, 8, 13, 15, 16, 18, 19, and 22; July 8, 14,-17, 20-23, 27, and 29-31; August 2-8, 10-14, 18-21, 24-28, and 31; September 1-4, 7-18, 21-25, and 29-30; October 1-2, 5-9, 12-16, 19-24, 26-30; November 1-20, 22-24, and 29-30; and December 1-4, 6-23, and 28-31.  On any of these days, the Nixon attorney performing the work could have picked up the phone, sent correspondence, or interjected into the meeting or conversation to alert Neogenix that the Finder Fee Program was improper or that Mintz had recognized that impropriety years before, that Gordon was aware of that recognition, and that he was concealing that information from his fellow officers and directors.

[8] Not accounting for unrecorded time, unrecorded work, or vague time entries, the particular days are as follows: January 3-8, 11-22, and 25-29; February 1-5, 8-19, 22-26, and 28; March 1-5, 8-26, and 29-31; April 1-2, 5-10, 12-23, and 25-30; May 1, 3-7, 11-14, 17-21, and 24-29; June 1-18 and 21-30; July 1-2, 5-9, 12-16, 19-23, and 26-30; August 1-6, 9-12, 16, 26, and 30-31; September 1-3, 7-8, 10, 13-17, 20, 22-24, and 27-30; October 1, 3-8, 11-15, 17, 19-22, and 24-29; and November 1-5, 8-12, 15-19, 23, 24, 29, and 30.  On any of these days, the Nixon attorney performing the work could have picked up the phone, sent correspondence, or interjected into the meeting or conversation to alert Neogenix that the Finder Fee Program was improper or that Mintz had recognized that impropriety years before, that Gordon was aware of that recognition, and that he was concealing that information from his fellow officers and directors.

69.     Despite at least fifteen Nixon attorneys spending portions of at least 497 days focusing on Neogenix's PPMs and capitalization issues or communicating with Neogenix officers or directors, at no point did Nixon inform any other Neogenix officer or director that the company was not permitted to pay commissions to unlicensed finders or that Mintz had informed Gordon of that fact back in April 2005.  Nixon intended to and succeeded in keeping Neogenix in the dark to keep the work (and the fees) coming in.  The entire period that Nixon served as Neogenix's outside corporate counsel, the company reasonably and justifiably relied on Nixon's silence regarding the improprieties associated with the Finder Fee Program and the paying of commissions to unlicensed finders to believe that the firm and its lawyers approved the Finder Fee Program and blessed the payment of those commissions.  Neogenix was also induced by Nixon's silence into reasonably believing that Gordon had no reason to suspect that the Finder Fee Program was improper.

70.     Gordon's concealment and the flaws in the Finder Fee Program were not even unearthed when Gordon arranged to have his longtime-friend and personal attorney, Daniel Scher, hired as Chief Legal Officer for Neogenix.  Scher, a licensed New York attorney, became Chief Legal Officer on January 20, 2010, but Scher had been involved with Neogenix since 2005, when Gordon had the company bring him on in an advisory capacity and pay him stock for his time.  Like Gordon, Scher worked primarily from Neogenix's offices in Great Neck, New York.

71.     At no point did Scher recognize or alert Neogenix that it should not pay unlicensed finders commissions in connection with their brokering sales of Neogenix stock.  Indeed, Scher was present at several Board meetings, including ten meetings between January 19, 2010 and February 24, 2011 where fundraising and the Finder Fee Program was discussed.  Yet, on information and belief, he never raised any questions regarding the propriety of the Finder Fee

24

Program and never questioned Nixon regarding whether the company should be paying commissions to unlicensed finders. Scher was later terminated for cause in January 2012.

72.     Altogether, Neogenix incurred more than $3.7 million in finder fees, which it paid in cash and stock. More than $2.6 million of these fees were paid during Nixon's tenure as Neogenix's outside corporate counsel, and more than $760,000 of those fees were paid when Scher was Chief Legal Officer in connection with the sale of approximately $10.2 million worth of Neogenix stock.

73.     The first time that anyone at Neogenix, other than Gordon, learned that the Finder Fee Program was improper was after Nixon was terminated as outside counsel in February 2011 due to its legal fees escalating "enormously." Feigin and Kass also used their move to Nixon to start charging Neogenix excessive and unreasonable legal fees for unnecessary or faulty work. Indeed, in 2009—before Neogenix became a publicly reporting company—Nixon charged Neogenix legal fees multiples above what Feigin and Kass had while at Mintz. The difference was not the result of higher hourly rates. Feigin's hourly rate was less at Nixon than it had been at Mintz, and Kass's hourly rate was a mere $15 per hour higher that year at Nixon than it had been at Mintz. Further, the $60,000 flat fee for corporate, finance, and securities-related services that Nixon began to charge Neogenix in December 2010 was almost double what comparable firms in the area were charging for those services.

74.     Neogenix's new outside counsel promptly alerted it to the improprieties and risks associated with the Finder Fee Program in early 2011. This caused an internal investigation that was still ongoing in October 2011, when the SEC launched its own inquiry.

### *The SEC Inquiry and The Company's Demise*

75.     On October 20, 2011, the SEC sent a letter to Neogenix requesting information and documents relating to the Finder Fee Program (the "SEC Inquiry"). The SEC asked who had received finder fees, the amount of those fees, the dates of those payments, and the purpose or reason for those payments.

76.     The SEC Inquiry and Neogenix's ongoing internal investigation uncovered just how poisonous Gordon's Finder Fee Program had been. Neogenix discovered that over $35 million of investments in Neogenix had been procured through unlicensed finders who received improper commissions. Due to the potentially voidable nature of these transactions, this translated into approximately $31 million in potential rescission claims and contingent liabilities for Neogenix at the time of the SEC Inquiry.

77.     The Finder Fee Program's indiscriminate compensation regime had foreseeable results in addition to the SEC Inquiry and the realization that Neogenix faced massive potential rescission liability.

78.     First, the SEC Inquiry and the resulting internal investigation delayed Neogenix from timely filing its quarterly and annual financial statements with the SEC. By 2010, Neogenix had become a publicly reporting company. The realization that $31 million of what Neogenix had previously characterized as capital investment was potentially voidable sent shockwaves through the company and greatly hindered its ability to prepare accurate financial statements. As a result, Neogenix was not able to timely file its third quarter 2011 Form 10-Q or its 2011 Form 10-K. Further, it had to explain that the reason for these delays was the SEC Inquiry and the massive potential rescission exposure Neogenix faced.

26

79.     Second, it led to a dilemma over how to characterize, report, and value this potential rescission liability.  That further delayed Neogenix's filings of audited financial statements, and resolution of these complex issues required a lengthy consultation with the SEC Office of Chief Accountant.

80.     Third, the SEC Inquiry and the magnitude of the subsequent uncovering of the Finder Fee Program's impropriety all played out in the public domain.  Potential investors were alerted to these issues, which froze further additional investment in Neogenix during late 2011 and 2012.

81.     Meanwhile, the company's cash burn rate continued.  Neogenix promptly launched an aggressive campaign to cut costs and lower operational expenses in December 2011 and January 2012 while attempting to raise capital and explore strategic alternatives, but the Finder Fee Program's rancid effects and the stigma of the SEC Inquiry proved too much.

82.     On July 22, 2012, the Board approved the filing of the Bankruptcy Case, where substantially all of Neogenix's assets were sold to a stalking-horse bidder.  So far, the Bankruptcy Case has cost Neogenix over $3.5 million in fees and expenses.

### *The Downfall's Cause*

83.     Why, if notified in April 2005 that his Finder Fee Program was potentially toxic, would Gordon nevertheless pursue it and conceal its flaws and impropriety from his fellow officers, from the Board, and from the company to whom he owed fiduciary duties of care, undivided loyalty, good faith, and candor?  The answer is simple:  money and status.

84.     Gordon's original employment contract with Neogenix promised him a six-figure salary and a bonus of 50% of his annual salary as well as a 50% raise if his fundraising efforts hit certain targets.  These terms continued until Gordon's second employment contract, under which

27

he received $360,000 in salary plus an annual bonus of up to 50% of his salary if he secured certain investment levels.

85.     In addition to six-figure salaries and six-figure bonuses, Gordon's position as CFO also gave him access to Neogenix credit cards and company funds, which he used for personal and family expenses, such as multiple-day stays at luxury-suite hotels and resorts, meals, travel, and personal entertainment for both him and his wife, Anne Gordon.  He also abused his position by leasing two cars for himself and his wife and by forcing the company to cover over $33,000 in unauthorized expenses related to leasing, repairing, and paying the insurance costs of those automobiles.

86.     Once these abuses were discovered in the spring of 2011, Gordon was asked to resign, which he did.  But until then, Gordon used his lofty position to convince his fellow officers and Board members that Neogenix should hire or otherwise bring in close friends and former colleagues who he knew would be loyal to him and who would help him obtain the generous bonuses promised in connection with his fundraising campaigns.  These gentlemen included John Squire, Brian Lewis, and Harry Gurwitch.  Gordon first convinced the Board to name these individuals to another Gordon brainchild – the Business Advisory Board of Neogenix.  As compensation for joining the Business Advisory Board, all members received 25,000 shares of Neogenix stock and were paid at least $2,000 annually plus travel expenses to fulfill their duties and attend Business Advisory Board meetings in Great Neck, New York.  On information and belief, members of the Business Advisory Board owed Neogenix fiduciary duties of care and good faith.  Neogenix and the Board placed trust and confidence in the Business Advisory Board and its members and charged them with the obligation to advise the Board and the company on all

business decisions and policies as well as to advise them on market conditions in the biotechnology and pharmaceutical industry.

87.    After providing these gentlemen with advisory positions in the company and stock, Gordon next convinced the Board to hire their companies as consultants and financial advisors. For example, Gordon and Feigin convinced the Board to hire Gurwitch's company, American Southern Financial Group, LLC, as Neogenix's exclusive financial advisor to a $5 million fundraising effort. Gordon also positioned another of Gurwitch's companies, Springhill Capital LLC to be hired to provide investment banking services to Neogenix, for which Springhill was to reap millions.

88.    But there was still more money to be made. To that end, Gordon retained these three gentlemen or their companies as finders to help him raise capital. Specifically, Squire, Lewis (through his company, Grosvenor Capital Markets Inc.), and Gurwitch (through his company, Springhill Capital), became participants in the Finder Fee Program. Squire received more than $1.4 million in cash commissions in just over two years. Lewis (through Grosvenor Capital Markets) received more than $215,000 in cash commissions in 2009 alone. And Gurwitch, in addition to fees received (through American Southern Financial Group) for advising on different offerings, collected (through Springhill Capital) more than $22,000 in cash commissions in 2010.

89.    Of course, none of these individuals was licensed as a broker by the SEC. They therefore would not have received any of these commissions if Gordon had followed the legal advice he received in April 2005 or if he or Mintz or Nixon had disclosed that advice to his fellow officers or directors. Instead, Gordon and these individuals were able to keep the company at-large in the dark and control any inquiry into their conduct through their positions on the Business Advisory Board.

90.     In concealing Mintz's April 2005 memorandum and its recognition of improprieties associated with the Finder Fee Program, Gordon totally abandoned Neogenix's interests and acted entirely for his own purposes and for the benefit of himself, Squire, Lewis, Gurwitch, and possibly others. Gordon's misconduct in failing to disclose that recognition to his fellow officers and directors benefited only himself and associates like Squire, Lewis, and Gurwitch—who, although they served on the Business Advisory Board, were never Neogenix employees, officers, or directors. They were, however, unbeknownst to Neogenix, running a side company called 1st U.S. Capital Corporation ("1st U.S. Capital"), where Gordon, Scher, Squire, Lewis, and Gurwitch all served as officers and presumably shareholders. In structuring the Finder Fee Program to pay his buddies commissions when the law prohibited him from doing so, Gordon was, in effect, looting Neogenix for their benefit. These men had no legal right to the commissions that Gordon paid them from Neogenix accounts, and Gordon knew it.

91.     Neogenix gained nothing by being kept in the dark as to the advice that Gordon received concerning the impropriety of paying commissions to unlicensed finders like Squire, Lewis, and Gurwitch. Paying commissions to unlicensed finders did not attract investors or customers or raise funds for corporate purposes. It was not essential to the sale of Neogenix stock. Nor did the payment of these commissions or Gordon's concealment of that impropriety defraud investors or other outsiders for Neogenix's benefit. The only misled party was Neogenix.

92.     Neogenix would have raised the same amount of capital without paying commissions to unlicensed finders. The information in the PPMs would have been the same—with an additional proviso that only licensed finders would receive commissions—and the PPMs would have gone to the same investors. Again, no investor bought stock just because their "finder" was going to be paid a commission, and no investor was misled by anything in the PPMs or other

30

Neogenix statements. Further, the only defect in the Finder Fee Program was the payment of commissions to unlicensed finders. Neogenix could have used the same unlicensed finders, paid them flat fees or hourly rates unrelated to success, and restricted their involvement in negotiations. This would pass muster under securities laws. The unlicensed finders who received the most commissions also held stock in Neogenix from their role on the Business Advisory Board or through their own purchases. They would have already been incentivized by that flat fee and their existing stake to seek out the same investors that they did.

93.     Likewise, Neogenix just as easily could have limited its payment of commissions to licensed finders. These licensed finders would have been paid the same percentages of successful sales as the unlicensed finders were and thus received the same level of incentive to seek out and procure investment. Such a strategy, in fact, may have led to more capital being raised than was attained through the use of unlicensed finders.

94.     Neogenix never got these opportunities and never knew alternatives to the Finder Fee Program were necessary because Gordon hid the truth from the company and did so in a manner completely adverse to his fiduciary duties.

95.     The negligence of Feigin and Kass—first at Mintz and then at Nixon—helped keep Gordon's cover-up going. Through the wrongful nondisclosure of Feigin and Kass and their firms, Mintz and Nixon, Neogenix's other officers and directors were never alerted to the truth that paying commissions to unlicensed finders like Squire, Lewis, and Gurwitch threatened Neogenix's future by ensuring that every single share of stock sold by these and other unlicensed finders created significant potential rescission liability for the company.

96.     Feigin and Kass benefited by their silence, because it allowed them and their firms to continue to bill Neogenix for services and to collect legal fees that they would not have

otherwise received.  Their work for Neogenix generated significant legal fees of nearly $750,000

for Mintz and almost $3.5 million for Nixon.  Neogenix, on information and belief, was one of

Feigin's largest clients, and over the years, Feigin and Kass inflated their invoices to the point that

their fees were excessive and unwarranted and constituted an act of malpractice.

### *The Missed Opportunities*

97.     Had they been informed of the improprieties associated with the Finder Fee

Program, Neogenix's officers and directors could have easily avoided or fixed those problems,

thereby saving the company from ruin.  Gordon and his allies never controlled the Company.  They

were never majority shareholders in Neogenix, and Gordon was always outnumbered on the

Board.[9]  Gordon, Mintz, Nixon, Squire, Lewis, and Gurwitch, simply kept material information

from the Board, robbing it of the opportunity to discover the impropriety of what was going on.

98.     If the other Neogenix officers or directors had been told the truth and had been

alerted to the improprieties associated with the Finder Fee Program, they would have ceased

paying commissions to unlicensed finders.  Moreover, if the Board had been alerted to the Finder

Fee Program's flaws, the Board would have immediately cured these flaws, long before the

commissions to unlicensed finders poisoned Neogenix's future.

99.     As stated above, the Board would have ceased compensating unlicensed finders in

any way that violated securities laws.  Neogenix would have, instead, begun using licensed finders

to whom it could pay commissions and/or compensated unlicensed finders in ways that complied

with securities laws, had competent outside counsel approved such methods.  Neogenix also would

have taken steps to ameliorate any potential rescission liability it faced.

---

[9] Even at the company's founding, Gordon was only one of three Board members.  When Gordon's concealment began, he was one of seven Board members.

100.    Even by the time that Nixon became the company's corporate counsel, the Board could have saved Neogenix from failure.  By 2009, Neogenix had paid just over $1 million in finder fees, less than half of what Neogenix would pay through the Finder Fee Program in the next three years.

101.    At that point, Neogenix could have conducted an internal investigation similar to the one conducted in 2011 to identify which compensated finders were not licensed, corrected the problem, notified the affected investors of the company's error, and asked those investors whether they wished to ratify their investment.  Thanks to the Defendants, Neogenix never got that opportunity.

## CAUSES OF ACTION

### COUNT 1
### Breach of Fiduciary Duty of Care
### (Against Peter Gordon)

102.    Neogenix incorporates by reference all of the allegations in each of the paragraphs above, as if fully set forth herein.

103.    As an officer of Neogenix, Gordon owed the company a duty to perform his duties in good faith, in a manner he reasonably believed to be in the best interests of the company, and with the care that an ordinary prudent person in a like position would use under similar circumstances.

104.    Gordon breached these duties when he ignored the advice he received from Mintz in April 2005 concerning the Finder Fee Program and continued to have Neogenix pay commissions to unlicensed finders as part of his fundraising campaigns.  He did not act in good faith; he did not act in a manner that one could reasonably believe to be in the best interests of the company; and an ordinary prudent person in a like position would not have ignored advice solicited

33

and received from outside legal counsel concerning the method by which he or she intended to raise capital. At the very least, Gordon should have sought further clarification or a second opinion. He did nothing.

105.    These breaches were direct and proximate causes of damages to Neogenix, including payment of improper finder fees, the costs related to the SEC Inquiry, the costs of the Bankruptcy Case, and the complete loss of Neogenix's value.

### COUNT 2
**Breach of Fiduciary Duty of Loyalty**
**(Against Peter Gordon)**

106.    Neogenix incorporates by reference all of the allegations in each of the paragraphs above, as if fully set forth herein.

107.    As an officer of Neogenix, Gordon owed the company a duty of loyalty. This duty mandates that the best interest of the company and its shareholders takes precedence over any interest possessed by Gordon. To comply with this duty, Gordon must refrain from engaging in any self-interested transaction, particularly a transaction that is unfair to the company.

108.    Gordon breached this duty by violating and abusing Neogenix's expense authorization and reimbursement policies as stated above. Gordon repeatedly incurred, without prior or subsequent authorization, significant unauthorized expenses for personal and family purposes. Gordon also placed his adult son on Neogenix's health insurance plan, despite his son not being a Neogenix employee and despite his never receiving authorization for this action.

109.    These breaches were direct and proximate causes of damages to Neogenix, including payment of improper personal expenses for Gordon and his family.

## COUNT 3
### Breach of Fiduciary Duty of Candor and Good Faith
### (Against Peter Gordon)

110.    Neogenix incorporates by reference all of the allegations in each of the paragraphs above, as if fully set forth herein.

111.    As an officer of Neogenix, Gordon owed the company a fiduciary duty to act in good faith and to disclose information that is significant and material to Neogenix's affairs such that the company would reasonably want to know that information.

112.    Gordon breached these duties by concealing the advice that he had received that Neogenix could not compensate unlicensed finders for their successful sales of company stock.

113.    This information was significant and material to Neogenix because it would have alerted the company to the fact that an integral part of its capital campaign and fundraising efforts was not permitted by the SEC.  It would have also alerted Neogenix to the fact that paying commissions to unlicensed finders exposed the company to massive potential rescission liability and could plunge it into insolvency and bankruptcy.

114.    Gordon's nondisclosure of this material information induced Neogenix to continue to employ, in unaltered form, the Finder Fee Program, and to eventually incur approximately $31 million in potential rescission liability.

115.    This nondisclosure was a direct and proximate causes of damages to Neogenix, including the payment of improper finder fees, the costs related to the SEC Inquiry, the costs of the Bankruptcy Case, and the complete loss of Neogenix's value.

### COUNT 4
### Legal Malpractice and Breach of Fiduciary Duty
### (Against Mintz)

116.    Neogenix incorporates by reference all of the allegations in each of the paragraphs above, as if fully set forth herein.

117.    An attorney-client relationship existed between Neogenix and Mintz.

118.    At all times between 2005 and November 10, 2008, Feigin and Kass were Mintz attorneys and acting on Mintz's behalf within the scope of their actual and apparent agency. During this period, they as well as other Mintz attorneys provided legal services to Neogenix pursuant to a 2004 engagement agreement between Neogenix and Mintz.

119.    Mintz failed to exercise the reasonable skill and knowledge commonly possessed by a member of the legal profession by failing to disclose to anyone at Neogenix other than Gordon its opinion that the Finder Fee Program was defective insofar as it required Neogenix to pay commissions to unlicensed finders and failed to disclose that Gordon was concealing that fact from Neogenix.

120.    Mintz knew that the SEC prohibited Neogenix from paying commissions to unlicensed finders, and Mintz knew that Gordon was actively concealing that fact.

121.    As attorneys and fiduciaries, Mintz had a duty to disclose the Finder Fee Program's impropriety, Mintz's judgment of that impropriety, and Gordon's concealment of that impropriety to others at Neogenix, whether at the Board meetings Mintz attorneys attended where payment of finder fees and the PPMs were discussed or otherwise. Indeed, Mintz had an obligation to proceed "as [was] reasonably necessary in the best interest of" Neogenix. Here, that obligation required Mintz to, at a minimum, re-urge its advice of the Finder Fee Program's impropriety, to recommend that Neogenix seek a second opinion regarding the Finder Fee Program, and/or to raise the Finder

36

Fee Program's impropriety with Gordon's fellow officers and directors. Mintz instead chose to remain silent with the intent that Neogenix's other officers and directors rely on that silence while knowing they would be deceived by it.

122.     The Finder Fee Program's impropriety, Mintz's judgment of that impropriety, and Gordon's concealment of both that impropriety and Mintz's judgment on that issue were material facts. Neogenix would have wanted to know that one of its methods of raising capital was prohibited by the SEC and exposed it to significant potential investor rescission claims. Neogenix would also have wanted to know that its outside counsel had determined that its method of raising capital was improper. And Neogenix would have wanted to know that its CFO was concealing both that impropriety and Mintz's judgment of that impropriety from the company.

123.     Mintz knew that Neogenix was not aware of these material facts. Mintz knew that Gordon had been tasked with seeking Mintz's approval of Neogenix's fundraising methods—including the Finder Fee Program—and Mintz knew that Neogenix was proceeding as if Mintz had approved those methods, when the opposite was true.

124.     Mintz deliberately remained silent and did not disclose these material facts to Neogenix.

125.     Neogenix justifiably relied on Mintz's deliberate silence. It conducted three private placements while Mintz was still Neogenix's outside corporate counsel under terms that required Neogenix to pay commissions to unlicensed finders. Those placements created significant potential rescission liability for Neogenix for every dollar invested and required Neogenix to pay more than $1 million under the Finder Fee Program. Neogenix would not have exposed itself to significant potential rescission liability in these transactions but for Mintz's intentional silence.

126.    By deliberately remaining silent when it had an ethical and fiduciary duty to speak, Mintz proximately caused injury to Neogenix, which resulted in damages in the form of improperly paid finder fees, the costs related to the SEC Inquiry, the costs of the Bankruptcy Case, and the complete loss of Neogenix's value.

### COUNT 5
### Legal Malpractice
### (Against Nixon)

127.    Neogenix incorporates by reference all of the allegations in each of the paragraphs above, as if fully set forth herein.

128.    An attorney-client relationship existed between Neogenix and Nixon.

129.    At all times between November 10, 2008 and February 2011, Feigin and Kass were Nixon attorneys and acting on Nixon's behalf within the scope of their actual and apparent agency. During this period, they as well as other Nixon attorneys provided legal services to Neogenix.

130.    Nixon failed to exercise the reasonable skill and knowledge commonly possessed by a member of the legal profession by failing to alert Neogenix to the impropriety of paying commissions to unlicensed finders and by failing to alert Gordon's fellow officers and directors that he was concealing that he had been advised by Mintz that such commissions were improper.

131.    Nixon knew that Neogenix's Finder Fee Program compensated unlicensed finders. Further, Nixon knew or should have known that this practice was improper and would expose Neogenix to significant potential rescission liability. Nevertheless, Nixon never advised Neogenix to stop paying commissions to unlicensed finders; nor did Nixon ever advise Neogenix of the risks of continuing the Finder Fee Program.

132.    Also, Nixon knew that Gordon was actively concealing from Neogenix's other officers and directors that he knew that Mintz had recognized that Neogenix's payment of

38

commissions to unlicensed finders was improper. At the very least, Nixon knew or should have known that no action was being taken with regard to improprieties previously identified regarding the Finder Fee Program.

133.    Nixon was therefore compelled to protect Neogenix by proceeding as reasonably necessary in the best interest of the company.

134.    Nixon had an obligation to raise the matter with Gordon, to recommend Neogenix seek a second opinion regarding the Finder Fee Program's payment of commissions to unlicensed finders, and to raise the issue with Gordon's fellow officers and directors.

135.    It was not in Neogenix's best interest for Nixon to do nothing. Nor was Nixon's silence a reasonable error in professional judgment.

136.    Nixon also had an obligation to charge no more than a reasonable fee for reasonable and necessary services. Nixon instead overcharged Neogenix by overworking and overbilling the file and then began to charge Neogenix an unreasonable flat fee that was almost twice what a reasonable attorney would charge for comparable services. This conduct by Nixon was unconscionable and breached their professional and ethical duties to Neogenix.

137.    Neogenix suffered damages as a result of Nixon's malpractice, which proximately caused Neogenix to suffer loss in the form of improperly paid finder fees, the costs related to the SEC Inquiry, the costs of the Bankruptcy Case, and the complete loss of Neogenix's value.

### COUNT 6
### Legal Malpractice
### (Against Scher)

138.    Neogenix incorporates by reference all of the allegations in each of the paragraphs above, as if fully set forth herein.

139.    An attorney-client relationship existed between Neogenix and Scher.

39

140.    At all times between January 2010 and January 2012, Scher provided legal services to Neogenix as its Chief Legal Officer.

141.    Scher failed to exercise the reasonable skill and knowledge commonly possessed by a member of the legal profession and that failure was not a reasonable error in professional judgment.

142.    Scher knew that Neogenix's Finder Fee Program compensated unlicensed finders. Further, Scher knew or should have known that this practice was improper and would expose Neogenix to significant potential rescission liability and inquiry by the SEC. Nevertheless, Scher never advised Neogenix to stop paying commissions to unlicensed finders; nor did Scher ever advise Neogenix of the risks of continuing to pay those commissions.

143.    Neogenix suffered damages as a result of Scher's malpractice, which proximately caused Neogenix to suffer loss in the form of improperly paid finder fees, the costs related to the SEC Inquiry, the costs of the Bankruptcy Case, and the complete loss of Neogenix's value.

## COUNT 7
### Aiding and Abetting Breach of Fiduciary Duty
### (Against Mintz and Nixon)

144.    Neogenix incorporates by reference all of the allegations in each of the paragraphs above, as if fully set forth herein.

145.    Gordon breached his fiduciary duty of candor and good faith to Neogenix by concealing the improprieties in the Finder Fee Program and Mintz's recognition of those improprieties from his fellow officers and directors.

146.    Mintz and Nixon, via the acts of their agents, including Feigin and Kass, knowingly participated in, encouraged, and substantially assisted that breach.

147.    Mintz and Nixon knew that Gordon was breaching his fiduciary duties by his concealment.

148.    Mintz and Nixon aided and abetted Gordon's nondisclosure and active concealment by never raising those defects or that advice with anyone at Neogenix, despite attending several Board meetings where the Finder Fee Program and the payments of commissions to unlicensed finders were discussed. Mintz and Nixon also substantially assisted Gordon's breach by reviewing and approving the provisions in the PPMs and contracts that required Neogenix to pay commissions to unlicensed finders. By blessing these items, Mintz and Nixon allowed Gordon to avoid any suspicion that Neogenix's outside counsel had told him that paying commissions to unlicensed finders was improper.

149.    Neogenix was damaged by this aiding and abetting. Mintz or Nixon coming forward with the information that Gordon was concealing would have allowed Neogenix to stop or at least ameliorate the harm otherwise suffered.

150.    Because Mintz and Nixon did not come forward or otherwise alert Neogenix to Gordon's concealment, they were a substantial factor in causing the harm that Neogenix suffered in the form of improperly paid finder fees, the costs related to the SEC Inquiry, the costs of the Bankruptcy Case, and the complete loss of Neogenix's value.

### COUNT 8
### Breach of Fiduciary Duty
#### (Against Squire, Gurwitch, Scher, and Buckley as personal representative)

151.    Neogenix incorporates by reference all of the allegations in each of the paragraphs above, as if fully set forth herein.

152.    As members of the Business Advisory Board, Squire, Lewis, and Gurwitch owed fiduciary duties of care and good faith to Neogenix. As an officer of Neogenix, Scher owed these

41

same fiduciary duties to Neogenix. Each therefore owed Neogenix a duty to perform their duties in good faith, in a manner reasonably believed to be in the best interests of the company, and with the care that an ordinary prudent person in a like position would use under similar circumstances.

153.     On information and belief, Squire, Lewis, and Gurwitch ensured that the Business Advisory Board did not audit or otherwise investigate the propriety of the Finder Fee Program that was lining their pockets or those of their companies. And they ensured that Neogenix did not reach out to other attorneys or firms to seek their opinion regarding the propriety of the commissions they or their companies were receiving through the Finder Fee Program. In turning a blind, conflicted eye, Squire, Lewis and Gurwitch failed to act as a reasonably prudent person in a like position would have under similar circumstances.

154.     Scher, despite being the sole member of Neogenix's legal department, did nothing to independently vet or otherwise test the propriety of the Finder Fee Program. And he, despite his position as Chief Legal Officer, never reached out to Mintz or Nixon or any other attorney to obtain a legal opinion, whether formal or informal, regarding the Finder Fee Program. In doing nothing, Scher failed act as an ordinary prudent person in a like position would have under similar circumstances.

155.     Further, Squire, Lewis, Gurwitch, and Scher were also all participants in Gordon's side financial investment services firm, 1st U.S. Capital. On information and belief, these five men improperly obtained and used Neogenix's confidential and proprietary information in connection with this side venture in derogation of their duties to Neogenix. Indeed, Scher continued to allow Gordon access to Neogenix's private network and shareholder lists and contact information well after the company asked Gordon to resign. This conduct also breached their fiduciary duties of care.

156. These breaches were direct and proximate causes of damages to Neogenix, including payment of improper finder fees, the costs related to the SEC Inquiry, the costs of the Bankruptcy Case, and the complete loss of Neogenix's value.

### COUNT 9
### Unjust Enrichment
### (Against Squire)

157. Neogenix incorporates by reference all of the allegations in each of the paragraphs above, as if fully set forth herein.

158. Squire was not licensed to be a broker by the SEC or any state authority. He nevertheless received finder fees from Neogenix in excess of $1.4 million for his successfully arranging and completing various sales of Neogenix stock.

159. Neogenix should have never paid these fees to Squire and would not have paid these commissions had Squire or Gordon honored their fiduciary obligations to Neogenix.

160. As a result, Squire was unjustly enriched by these finder fees, and it is against equity and good conscience to permit him to retain that which he is legally forbidden from receiving.

## TOLLING OF LIMITATIONS

161. All statutes of limitations applicable to Neogenix's claims have been tolled since the filing of the Bankruptcy Case on July 23, 2012, pursuant to 11 U.S.C. § 108.

162. Prior to that, the statutes of limitations for Neogenix's claims against Mintz and Nixon were tolled by the continuous representation doctrine and discovery rule. Feigin and/or Kass continuously represented Neogenix beginning in 2004 until the company terminated its engagement with Nixon in February 2011. Additionally, the first time that Neogenix was made aware of potential claims relating to the Finder Fee Program or facts that would lead a reasonable person to discover those claims was in the spring of 2011, when informed by the outside counsel

43

that replaced Nixon. Until that point, Neogenix was blamelessly unaware that there were any improprieties associated with the Finder Fee Program due to the concealment of Gordon and the improper conduct of Mintz and Nixon.

163. Likewise, under the "continuation of events" doctrine, the statute of limitations on Neogenix's claims against insider fiduciaries did not begin to run until, at the earliest, when those relationships ended. Gordon's fiduciary relationship with Neogenix ended in May 2011. Scher's fiduciary relationship with Neogenix ended in January 2012. Squire and Gurwitch owed fiduciary duties to Neogenix as members of the Business Advisory Board until at least January 2011. And Lewis owed fiduciary duties to Neogenix as a member of the Business Advisory Board until his death in November 2010. Per New York law, the next 18 months are not included in the calculation of any limitations. Thus, limitations against Mr. Buckley, as Lewis's personal representative, did not begin to run until May 2012.

## JURY DEMAND

164. Neogenix hereby demands trial by jury of all issues.

## PRAYER

WHEREFORE, Neogenix respectfully requests that judgment be entered in its favor against the Defendants as follows:

(a) awarding compensatory, consequential, and/or monetary damages in an amount to be determined at trial;

(b) disgorging all fees and other monies unjustly paid to Mintz, Nixon, and Squire, and award such fees and other monies to Neogenix;

(c) awarding pre-judgment and post-judgment interest at the maximum rate permitted by law or equity;

(d) awarding Neogenix's reasonable and necessary attorney's fees and expenses, together with all costs of court; and

(e)    granting such other and further relief, at law or in equity, as this Court deems just and proper.


Dated:  July 22, 2014

                                        Respectfully submitted,


                                        William T. Reid, IV (WR-2702)
                                        Rachel S. Fleishman (RF-5080)
                                        REID COLLINS & TSAI LLP
                                        One Penn Plaza, 49th Floor
                                        New York, New York 10119
                                        T:  (212) 344-5200
                                        F:  (212) 344-5299

                                        -and-

                                        Eric D. Madden (TX 24013079)
                                        Brandon V. Lewis (TX 24060165)
                                        REID COLLINS & TSAI LLP
                                        Thanksgiving Tower
                                        1601 Elm Street, 49th Floor
                                        Dallas, Texas 75201
                                        T:  (214) 420-8900
                                        F:  (214) 420-8909