**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
NEOGENIX ONCOLOGY, INC.,

                      Plaintiff,

       - against -

PETER GORDON, MINTZ LEVIN COHN
FERRIS GLOVSKY and POPEO P.C.,
NIXON PEABODY LLP, DANIEL J. SCHER,
HARRY GURWITCH, and MAIE LEWIS, not
individually but as personal representative of the
Estate of BRIAN LEWIS,

                   Defendants.
--------------------------------------------------------X

                           **MEMORANDUM**
                         **AND ORDER**

                CV 14-4427 (JFB) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

**I.**    <u>P**RELIMINARY** S**TATEMENT**</u>

       This case involves claims for breach of fiduciary duty and legal malpractice primarily

against former law firms and attorneys who provided services to Neogenix Oncology, Inc.

("Plaintiff" or "Neogenix").  Neogenix is "a publicly reporting biotechnology company focused on

developing genetically engineered cancer treatments."  *See* Amended Complaint ("Am. Compl.")

¶ 1 [DE 35].  Neogenix alleges that Defendants Peter Gordon, the law firms of Mintz, Levin,

Cohn, Ferris, Glovsky, and Popeo, P.C. and Nixon Peabody LLP, Daniel J. Scher, Harry Gurwitch,

the Estate of John Squire, and Maie Lewis (not individually but as personal representative of the

Estate of Brian Lewis) (collectively, the "Defendants"), orchestrated a "cover up" which

"prompted an SEC investigation" and ultimately forced Neogenix to "file for bankruptcy and sell

its assets under court supervision."  *Id*. ¶ 3.

Specifically, as part of an effort to raise money for the company, the former Chief Financial Officer of Neogenix, Defendant Peter Gordon, initiated the Finder Fee Program, under which Neogenix paid commissions to anyone who brokered a sale of Neogenix stock, regardless of whether those persons were registered with the Securities and Exchange Commission ("SEC"). *Id.* ¶¶ 25-26. Neogenix claims that at the time, it did not know that the Finder Fee Program violated the Securities Exchange Act of 1934, which essentially prohibits anyone from selling securities without first being registered with the SEC, and, in turn, bars a company from compensating these unlicensed brokers. *Id.* ¶ 29. As a result, Neogenix brought this suit against (1) its former Chief Financial Officer for breach of fiduciary duty in instituting the unlawful Finder Fee Program, and (2) all former counsel, chiefly Mintz Levin Cohn Ferris Glovsky and Popeo P.C. ("Mintz Levin"), for legal malpractice by allegedly failing to provide proper and timely legal advice with regard to the unlawful Finder Fee Program. *See generally id.*

Pending before the Court is a letter motion filed by Defendant Mintz Levin requesting that the Court issue an Order finding that Plaintiff "waived its attorney-client privilege as to communications on a key issue: the implications to Neogenix of paying fees to finders who were not licensed as brokers." *See* DE 49. Defendants Maie Lewis, Daniel J. Scher, Nixon Peabody, and Peter Gordon, join in support of Defendant Mintz Levin's motion. *See* DE 47, 48, 51, 52, and 54. Neogenix opposes the motion, arguing, *inter alia*, that although Neogenix waived the privilege as to Mintz Levin and Nixon Peabody by filing this action against those firms, Neogenix did not waive its privilege concerning communications with the company's successor counsel, namely, the firms of Greenberg Traurig and Nelson Mullins Riley & Scarborough LLP ("Nelson Mullins"). DE 64.

For the reasons set forth below, the Court DENIES Defendant Mintz Levin's motion to compel disclosure of Plaintiff's privileged attorney-client communications and work-product with Greenberg Traurig and Nelson Mullins regarding the Finder Fee Program.

## II.   BACKGROUND

### A.   Factual Background

Neogenix claims that its former Chief Financial Officer ("CFO"), Peter Gordon, "instigated the company's downfall." *See* Amended Complaint ("Am. Compl.") ¶ 25 [DE 35].  In particular, Gordon is alleged to have "devised an incentive program that, itself, did not raise capital for Neogenix, but rewarded individuals and companies who did." *Id*. ¶ 26.  "Under this incentive program—the 'Finder Fee Program'—Gordon had Neogenix pay commissions to anyone who brokered a sale of Neogenix stock, regardless of whether those persons were registered with the U.S. Securities and Exchange Commission (the 'SEC') or applicable state authorities." *Id*.  Both licensed and unlicensed finders who secured investment in the company were financially rewarded under this program. *Id*.  Plaintiff's "efforts to raise capital were successful" and the finders were "compensated in cash and in Neogenix stock and stock options." *Id*. ¶¶ 27-28.

However, "[u]nbeknownst to Neogenix, under Section 15 of the Securities Exchange Act of 1934, it is unlawful for 'any broker . . . to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker . . . is registered [with the SEC].'" *Id*. ¶ 29.  This federal statute defines "broker" as "any person engaged in the business of effecting transactions in securities for the account of others" and states have similar prohibitions in their own securities laws. *Id*.  In short, "issuers who reward unlicensed finders with transaction-based compensation risk rescission liability and enforcement actions by the SEC and states

3

attorneys general." *Id*. ¶ 30.  Neogenix avers that its payment of transaction-based compensation to unlicensed finders violated securities laws. *Id*. ¶ 31.  "[T]he lack of proper controls in the Finder Fee Program caused Neogenix to incur as much as $31 million in contingent liabilities— liabilities that could have been avoided entirely had the company: (a) not paid commissions to those unlicensed finders; and/or (b) secured those same investments through licensed brokers." *Id*. ¶ 32.

In or about 2005, Neogenix sought to "launch a broader capital campaign for the company" so the "Board instructed Gordon to seek advice from Mintz, the company's outside general counsel at the time, regarding the propriety of Neogenix's proposed private placement memorandum ('PPM')." *Id*. ¶ 35.  On April 5, 2005, Gordon asked "attorneys at Mintz to review and comment on a rough draft of that PPM, which described, among other things, the Finder Fee Program." *Id*. ¶ 35.  Shortly thereafter, on April 5, 2005, a Mintz attorney named Mark Wishner advised Gordon regarding the "impropriety of the Finder Fee Program." *Id*. ¶ 36.  Wisher wrote to Gordon that

> Your draft provides for the payment of commissions to officers and employees who sell units. **You cannot pay compensation to non-licensed intermediaries**.

*Id*. (emphasis in original).  Plaintiff alleges that "[t]his was a correct statement of the law" and that "Samuel Feigin, the Mintz shareholder responsible for the Neogenix engagement and relationship, was copied on this correspondence." *Id*.  Notwithstanding the foregoing guidance, Gordon and Feigin failed to acknowledge that the Finder Fee Program was improper, resulting in Gordon breaching his fiduciary duties as CFO and Mintz Levin breaching its fiduciary duties to Neogenix. *Id*. ¶ 37. As such, "the PPM continued to provide for the payment of 10% commissions to finders, proper controls were not implemented in the Finder Fee Program, and Neogenix was induced to

4

believe that Mintz had blessed all facets of the Finder Fee Program, including the indiscriminate compensation system." *Id.*

Gordon, as CFO of Neogenix, never disclosed to his other officers and directors at subsequent Board meetings the information concerning the illegality of the Finder Fee Program. *Id.* ¶ 38. Similarly, Feigin never disclosed this information, or the fact that Gordon had been told that Neogenix could not compensate unlicensed finders, to the company's other officers or directors. *Id.* Upon information and belief, neither did any other Mintz Levin attorney communicate this information to other Board members. *Id.* Plaintiff claims this created a "breach of fiduciary duty for Feigin—the Mintz shareholder responsible for the engagement and for Mintz's relationship with Neogenix—to intentionally withhold this information from Neogenix while knowing (1) its materiality, (2) that Neogenix was ignorant of it, and (3) that Neogenix would reasonably and justifiably rely on his and Mintz's silence as an endorsement of the Finder Fee Program and thus fail to implement restrictions on the company's Finder Fee Program in-line with Mintz's conclusions. Mintz was responsible for these failures by Feigin." *Id.*

Mintz Levin was Neogenix's sole corporate counsel at the time and knew that the Finder Fee Program's lack of controls risked rescission liability for the company. Likewise, Mintz Levin had recognized the "impropriety" of the Finder Fee Program as expressed in a memorandum to the CFO. *Id.* ¶ 50. However, CFO Peter Gordon, in breach of his fiduciary duties, concealed that understanding at numerous Board meetings as well as during other opportunities for disclosure (*e.g.*, presentations, PPMs). *Id.* Moreover, since Mintz Levin had a practice of addressing the Board on "any issue it deemed fit," Plaintiff claims that Feigin and his colleague at Mintz Levin, shareholder Mark Kass, were aware that Neogenix "would rely on their deliberate silence

5

concerning the Finder Fee Program's impropriety and Gordon's concealment and would see it as active approval of the Finder Fee Program and Gordon's conduct as CFO." *Id.*

In addition, Plaintiff notes that "despite at least seven Mintz attorneys spending portions of at least 254 days over three-and-a-half years working on Neogenix's PPMs and capitalization issues or communicating with members of the Board, at no point did Mintz inform any other Neogenix officer or director that the company was not permitted to pay commissions to unlicensed finders or that Mintz had informed Gordon of that fact back in April 2005 or that Gordon and Mintz were concealing these facts from Neogenix." *Id.* ¶ 57. In fact, "[t]he entire period that Mintz served as Neogenix's outside corporate counsel, the company reasonably and justifiably relied on Mintz's silence to believe that the firm and its lawyers approved the Finder Fee Program and blessed the payment of commissions to unlicensed finders." *Id.* Consequently, "Neogenix was also induced by Mintz's silence into reasonably believing that (1) Gordon had no reason to suspect that the Finder Fee Program was improper and (2) Gordon was being honest and forthright with respect to Mintz's judgment of the Finder Fee Program's propriety." *Id.*

Plaintiff alleges that this "cover-up continued when Feigin and Kass left Mintz Levin for Nixon Peabody in late 2008. As Feigin and Kass had been performing 'all of the Company's corporate and employment work' to that point, Feigin asked his long-time client to come with him when he left. Neogenix agreed." *Id.* ¶ 60. The alleged improprieties continued after Neogenix was retained by Nixon Peabody, as Feigin and Kass remained on as counsel to Neogenix on "all corporate, finance, and securities-related matters." *Id.* ¶¶ 61-64.

Plaintiff maintains that "[a]ny lawyer exercising that degree of care, skill, and diligence commonly possessed and exercised by members of the legal community would have known that it

was at least negligent for Nixon to, amongst other things, participate in Board meetings, prepare

PPMs, advise on securities registrations, and charge for these services, but choose not to (1) inform

Neogenix that the payment of commissions to unlicensed finders violated securities laws or

(2) implement controls to prohibit the payment of such commissions." *Id*. ¶ 65. Moreover,

Neogenix claims that "any lawyer exercising that degree of care, skill, and diligence commonly

possessed and exercised by members of the legal community would have known that it was at least

negligent for Nixon (via Feigin and possibly also Kass) to know that Neogenix's CFO was

concealing material, adverse information from his fellow officers and directors, yet withhold that

fact from its client." *Id*. Nixon Peabody, nonetheless, remained silent when it had a duty to speak,

according to the Amended Complaint, in violation of the standard of care and its ethical and

fiduciary duties. *Id*.

Subsequently, "Gordon arranged to have his longtime-friend and personal attorney,

Daniel Scher, hired as Chief Legal Officer for Neogenix." *Id*. ¶ 78. Scher became the Chief Legal

Officer, effective January 20, 2010, however, he had been involved with Neogenix since as early

as 2005, at which time Gordon had the company bring him on in an advisory capacity and pay him

stock for his time. *Id*. "At no point did Scher recognize or alert Neogenix that it should not pay

unlicensed finders commissions in connection with their brokering sales of Neogenix stock." *Id*.

¶ 79.

The Plaintiff states that "[t]he first time that anyone at Neogenix, other than Gordon,

learned that the Finder Fee Program was improper was after Nixon was terminated as outside

counsel in February 2011 due to its legal fees escalating 'enormously.'" *Id*. ¶ 81. Neogenix

alleges that its "new outside counsel promptly alerted the company to the impropriety

and risks associated with the Finder Fee Program in early 2011." *Id*. ¶ 82. That alert triggered an internal investigation at Neogenix which was still ongoing in October 2011 when the SEC launched its own inquiry. *Id*.

On October 20, 2011, the SEC sent a letter to Neogenix in which it requested information and documents pertaining to the Finder Fee Program. *Id*. ¶ 83. The SEC inquiry disclosed approximately $31 million in potential rescission claims and contingent liabilities. *Id*. ¶ 84. Despite efforts made by Neogenix to address the adverse consequences of the Finder Fee Program on its finances, the "Finder Fee Program's rancid effects and the stigma of the SEC Inquiry proved too much." *Id*. ¶ 89. Therefore, on July 22, 2012, the Neogenix Board "approved the filing of the Bankruptcy Case, where substantially all of Neogenix's assets were sold to a stalking-horse bidder." *Id*. ¶ 90. As of the date of the Amended Complaint, Neogenix has incurred over $3.5 million in fees and expenses stemming from the bankruptcy proceeding. *Id*.

The Amended Complaint asserts that "[o]nce these abuses were discovered in the spring of 2011, Gordon was asked to resign, which he did." *Id*. ¶ 94. However, prior to his departure, "Gordon used his lofty position to convince his fellow officers and Board members that Neogenix should hire or otherwise bring in close friends and former colleagues who he knew would be loyal to him and who would help him obtain the generous bonuses promised in connection with his fundraising campaigns." *Id*. These individuals included Defendants John Squire, Brian Lewis, and Harry Gurwitch. *Id*. Gordon persuaded the Board to name these persons on the Business Advisory Bureau of Neogenix, for which they were compensated with Neogenix stock, *inter alia*, and travel expenses. *Id*.

Neogenix maintains, upon information and belief, that these individuals, too, owed fiduciary duties of care, loyalty, and good faith to Neogenix. *Id*. ¶ 95.  "Both Neogenix and the Board placed trust and confidence in the Business Advisory Board and its members and charged them with the obligation to advise the Board and the company on all business decisions and policies as well as to advise them on market conditions in the biotechnology and pharmaceutical industry." *Id*.  "After providing Squire, Lewis, and Gurwitch with fiduciary positions in the company and stock, Gordon next convinced the Board to hire their companies as consultants and financial advisors," and to retain these three individuals or their companies to help raise capital for Neogenix as participants in the Finder Fee Program. *Id*. ¶¶ 95-96.  None of these Defendants were licensed as brokers by the SEC. *Id*. ¶ 98.  However, they received commissions anyway because Gordon failed to follow the "legal advice he received in April 2005" or "disclose[] that advice to his fellow officers or directors." *Id*.  Neogenix concludes that had its officers and directors been informed of the "impropriety associated with the Finder Fee Program," they could have "easily avoided or fixed those problems, thereby saving the company from ruin." *Id*. ¶ 107.

Based on these facts, Plaintiff asserts the following causes of action in the Amended Complaint:  (1) breach of fiduciary duty of care against Peter Gordon; (2) breach of fiduciary duty of loyalty against Peter Gordon; (3) breach of fiduciary duty of candor and good faith against Peter Gordon; (4) breach of fiduciary duty by fraudulent concealment against Mintz Levin; (5) legal malpractice against Nixon Peabody; (6) legal malpractice against Attorney Daniel Scher; (7) aiding and abetting breach of fiduciary duty against Mintz Levin and Nixon Peabody;

(8) breach of fiduciary duty against John Squire, Harry Gurwitch, Daniel Scher, and Maie Lewis as personal representative of the Estate of John Squire; and (9) unjust enrichment against John Squire. *Id.* ¶¶ 112-172.

### B.    Relevant Procedural History

Plaintiff filed the original Complaint on July 22, 2014.  DE 1.  Defendant Peter Gordon interposed an Answer on September 30, 2014.  DE 27.  On October 20, 2014, Plaintiff filed an Amended Complaint.  DE 35.

The Court held a Rule 16(b) Initial Conference on October 22, 2014.  DE 40.  In pertinent part, the parties were directed to engage in a good faith meet-and-confer regarding the "parameters of specific document production."  *Id*. ¶ 2.  The Court further directed that document requests concerning the "agreed-upon areas" were to be served by November 26, 2014.  *Id*.  Counsel were permitted to seek Court intervention on any outstanding discovery issues stemming from that document production by filing letter motions no later than November 14, 2014.  *Id*.  Opposition to any letter motions had to be filed by November 21, 2014.  *Id*.

On November 14, 2014, counsel for Defendant Mintz Levin filed a letter motion asking the Court to issue an Order that "Neogenix has waived the attorney-client privilege as to communications" on the "implications of paying fees to finders who were not licensed as brokers." *Id*.  On the same date, Defendants Maie Lewis, Daniel J. Scher and Harry Gurwitch filed letters adopting the arguments set forth in the Mintz Levin motion.  *See* DE 47, 48, 51, and 52.  Nixon Peabody filed its own substantive motion and agreed with Mintz Levin that Neogenix waived attorney-client privilege over all communications with the Greenberg Traurig and Nelson Mullins law firms.  DE 53.  Plaintiff submitted its opposition to these motions on November 21, 2014.

DE 64.

Subsequently, on December 22, 2014, Defendants Gordon, Scher, Mintz Levin, Lewis, Gurwitch, and Nixon Peabody filed separate Rule 12(b)(6) motions to dismiss the Amended Complaint. *See* DE 68, 70, 71, 72, 74, 75, and 76. For its part, Plaintiff filed a Rule 12(f) motion to strike portions of the Defendant Gordon's Answer on the grounds that Gordon improperly disclosed privileged communications in two of his affirmative defenses and a related exhibit. *See* DE 69. These motions remain *sub judice*.

With this context in mind, the Court now turns to the pending discovery motions.

## III.   DISCUSSION

### A.   Applicable Legal Standards

The attorney-client privilege safeguards confidentiality and transparent communications between client and counsel. *See, e.g., United States v. Sabbeth*, 34 F. Supp. 2d 144, 152 (E.D.N.Y. 1999) (noting "the overriding importance of the attorney-client privilege"); *see also In re Grand Jury Investigation*, 399 F.3d 527, 531 (2d Cir. 2005) ("[t]he purpose of the attorney-client privilege is to promote open communication between attorneys and their clients so that fully informed legal advice may be given") (internal quotation omitted); Restatement (Third) of the Law Governing Lawyers § 68 cmt. c (2000) ("The rationale for the [attorney-client] privilege is that confidentiality enhances the value of client-lawyer communications and hence the efficacy of legal services.").

The attorney-client privilege applies to "communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia,* 655 F.3d 126, 132 (2d Cir. 2011)

11

(citing *In re Cnty. of Erie,* 473 F.3d 413, 419 (2d Cir. 2007)); *McNamee v. Clemens*, No. 09 Civ. 1647, 2014 WL 6606661, at *2 (E.D.N.Y. Nov. 19, 2014).  "The burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it." *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL–CIO,* 119 F.3d 210, 214 (2d Cir. 1997); *see Mejia,* 655 F.3d at 132.  The attorney-client privilege "only protects disclosure of communications; it does not protect disclosure of the underlying facts." *Upjohn Co. v. United States*, 449 U.S. 383, 395-96, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981) (citations omitted); *Franzone v. Lask*, No. 14 Civ. 3043, 2015 WL 1379066, at *6 (S.D.N.Y. Mar. 26, 2015) (citing *Upjohn* 449 U.S. at 395-96); *Wultz v. Bank of China Ltd.*, 304 F.R.D. 384, 391 (S.D.N.Y. Jan. 21, 2015) ("However, we are unaware of any case law suggesting that a person's collection of information is protected merely because the person harbors a plan to provide the information later to an attorney—particularly where there is no proof that the attorney sought to have the individual collect the information at issue. Indeed, case law holds just the opposite.") (collecting cases).

 The so-called "work product privilege" is codified in Federal Rule of Civil Procedure 26(b)(3) which provides, in part, as follows:

> Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation.... But, subject to Rule 26(b)(4), those materials may be discovered if: (i) they are otherwise discoverable ...; and (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

> ... If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other legal representative concerning the litigation.

12

Fed. R. Civ. P. 26(b)(3); *see In re Grand Jury Subpoenas Dated Mar. 19, 2002 and Aug. 2, 2002,* 318 F.3d 379, 386 (2d Cir. 2003).  The work product privilege "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries."  *U.S. v. Adlman,* 134 F.3d 1194, 1196–97 (2d Cir. 1998) (quoting *Hickman v. Taylor,* 329 U.S. 495, 510-11, 67 S.Ct. 385, 91 L.Ed. 451 (1947)).  Unlike the attorney-client privilege, the work product privilege belongs to the attorney as well as the client, and cannot be waived by the client alone.  *See Solis v. Food Employers,* 644 F.3d 221, 232 (4th Cir. 2011); *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947); *In re Grand Jury Subpoenas,* 561 F.3d 408, 411 (5th Cir. 2009); *In re In–Store Adver. Sec. Litig.,* 163 F.R.D. 452, 458 (S.D.N.Y. 1995).

The attorney-client privilege, however, is not absolute.  In limited circumstances, it can be waived.  *Scott v. Chipotle Mexican Grill, Inc.,* --- F.Supp.3d ----, 2015 WL 1424009, at *10 (S.D.N.Y. Mar. 27, 2015) ("With some exceptions, the attorney-client privilege is automatically waived when a privileged communication is disclosed to a third party or litigation adversary.") (citing *See Ricoh Co., Ltd. v. Aeroflex Inc.,* 219 F.R.D. 66, 70 (S.D.N.Y.2003); *Kingsway Fin. Servs., Inc. v. Pricewaterhouse–Coopers LLP,* No. 03 Civ. 5560, 2007 WL 1837133, at *2 (S.D.N.Y. June 27, 2007) (" *Kingsway II* ") ("The attorney-client privilege is not absolute, however, and may be waived through, among other things, the voluntary disclosure of a privileged communication to a third party, especially a litigation adversary.") (collecting cases)).

One such waiver is "subject-matter waiver."  Specifically, voluntary disclosure of attorney-client communications "'during judicial proceedings may waive the privilege as to the disclosed information as well as all the otherwise privileged information relating to the same subject-

matter[.]'" *AP Links, LLC v. Russ*, No. 09 Civ. 5437, 2012 WL 3096024, at *5 (E.D.N.Y. July 30,

2012) (quoting *Robbins & Myers, Inc. v. J.M. Huber Corp.*, 274 F.R.D. 63, 94 (W.D.N.Y. 2001));

*see also Brewer v. Hall*, No. 00 Civ. 6072, 2005 WL 2219304, at *2 (E.D.N.Y. Sept. 12, 2005)

(stating that "[w]here there has been a disclosure of a privileged communication or a portion of

such communication in the context of a lawsuit," courts in the Second Circuit apply a rule of

"subject-matter waiver" and "require disclosure of all otherwise privileged communications on the

same subject").

Subject-matter waiver of attorney-client privilege is codified in Rule 502(a) of the Federal

Rules of Evidence.  "Rule 502 of the Federal Rules of Evidence, titled 'Attorney-Client Privilege

and Work Product; Limitations on Waiver,' provides that 'when [a] disclosure is made in a federal

proceeding or to a federal office or agency and waives the attorney-client privilege or work-

product protection, the waiver extends to an undisclosed communication or information in a

federal or state proceeding *only if*:  (1) the waiver is intentional; (2) the disclosed and undisclosed

communications or information concern the same subject matter; *and* (3) they ought in fairness to

be considered together.'"  *In re GM LLC Ignition Switch Litig.*, --- F.Supp.3d ----, 2015 WL

221057, at *11 (S.D.N.Y. Jan. 15, 2015) (quoting Fed. R. Evid. 502(a)) (emphasis added).  "As

the Advisory Committee Notes state, the Rule — enacted in 2008 — 'provides that a voluntary

disclosure in a federal proceeding or to a federal office or agency . . . generally results in a waiver

*only* of the communication or information disclosed.'"  *Id.* (quoting Fed. R. Evid. 502, Committee

Notes (emphasis added)).  "In particular, such disclosure results in a subject matter waiver of

undisclosed materials only in those 'unusual situations in which fairness requires a further

disclosure of related, protected information, in order to prevent a selective  and misleading

presentation of evidence to the disadvantage of the adversary.'" *Id*. (quoting Fed. R. Evid. 502, Committee Notes).

With this legal framework in mind, the Court now addresses the parties' respective arguments.

**B.    Analysis**

*1.    Whether There Was An Intentional Waiver*

As an initial matter, counsel for Mintz Levin asserts that Neogenix intentionally waived the attorney-client privilege regarding its communications with Mintz Levin and successor counsel, Nixon Peabody, by suing these two law firms in the instant action.  *See* DE 49 at 1.  In fact, Mintz Levin points out that "Neogenix even quotes from a 2005 Mintz Levin memo regarding payment of finders' fees."  *Id.* (quoting Am. Compl. ¶ 36).  Moreover, Mintz Levin argues that Neogenix, in its pleadings, "also disclosed the advice on the exact same subject (the propriety of paying finders' fees) that Neogenix received from Greenberg Traurig, successor counsel after Neogenix terminated Nixon Peabody."  *Id.*  For example, in the original Complaint, Plaintiff alleges that "the first time that Neogenix was made aware of potential claims relating to the Finder Fee Program or facts that would lead a reasonable person to discover those claims was in the spring of 2011, when informed by the outside counsel that replaced Nixon."  Complaint ("Compl.") ¶ 162 [DE 1].  The Amended Complaint similarly avers that "Neogenix's new outside counsel promptly alerted the company to the impropriety and risks associated with the Finder Fee Program in early 2011."  Am. Compl. ¶ 82.  Greenberg Traurig was Neogenix's new, or successor, outside counsel at that time. DE 49 at 1.

The SEC commenced its own investigation of the Finder Fee Program in October 2011.  *Id.* at 2 (citing Am. Compl. ¶ 82).  Mintz Levin argues that Neogenix intentionally waived its privilege several times during that investigation.  *Id.*  First, the law firm of Nelson Mullins, which represented Neogenix before the SEC, provided the SEC with a copy of Mintz Levin's 2005 memo and informed the SEC that "Neogenix has agreed to waive its attorney client privilege concerning the issue of advice pertaining to the use of Finders."  *See* DE 49, Ex. A. at 1.  In doing so, Neogenix provided the SEC with a letter to its shareholders in which Neogenix allegedly disclosed the substance of Greenberg Traurig's advice:

> We have consistently said that there is a reasonable possibility that some shareholders who bought their Neogenix shares from unlicensed finders…may have rescission rights…and we have also taken the position that we cannot conclude that it is probable that shareholders have valid rescission rights and will exercise them in an amount that can reasonably be determined.  (While the Company has received demands for rescission from some shareholders, we have not offered or given rescission to any shareholder).  *Those positions are based on extensive legal analyses performed by our outside counsel, Greenberg Traurig.*

DE 49 at 2 (quoting DE 49, Ex. A at 5) (emphasis supplied).

Likewise, Mintz Levin argues that Neogenix's counsel for the SEC investigation, Nelson Mullins, expressly waived the privilege on a second occasion by informing the SEC that Neogenix had

> determined to further review documents withheld pursuant to claims of attorney-client privilege or work product doctrine, *with an intention to waive and produce any such documents that related directly to the issue of any legal advice concerning the payment of Finders…*

*Id.* (quoting DE 49, Ex. B at 1) (emphasis supplied).  In short, Mintz Levin contends that these two waivers were "clearly intentional."  *Id.*

Neogenix counters that it has not waived the attorney-client privilege with respect to its communications with successor counsel Greenberg Traurig or Nelson Mullins.  DE 64.  Neogenix specifically maintains that neither its letters to the SEC, its letters to its shareholders, nor its pleadings constitute an intentional waiver of the attorney-client privilege regarding communications with successor counsel.  *Id*. at 1.  First, Neogenix argues that Mintz Levin has mischaracterized the two letters written to the SEC during the 2011 internal investigation.  *Id*. at 2.  The first letter, dated August 15, 2012, *see* DE 49-1, was written in response to the SEC's inquiry whether Mintz Levin or Nixon Peabody provided advice regarding the use of Finders.  DE 64 at 2.  Neogenix agreed to waive its privilege solely with respect to the 2005 memorandum, informing the SEC that this was the only document responsive to the inquiry.  *Id*.  Neogenix claims that the purpose of the second correspondence, dated November 1, 2012, *see* DE 49-2, was to inform the SEC that it had conducted a further review of its documents and did not find any other items responsive to the inquiry.  DE 64 at 2.

Neither did the letters to shareholders, Neogenix contends, waive the attorney-client privilege.  *Id*.  Although Neogenix concedes that the letters informed shareholders that Neogenix had discontinued the practice of paying unlicensed finders on advice of new counsel - - Greenberg Traurig - - neither of the letters "disclosed the substance of Greenberg's advice."  *Id*.  The mere fact that Neogenix disclosed it was relying on successor counsel's advice did not trigger a waiver according to Neogenix.  *Id*.

Third, Neogenix claims that the two sentences in the pleadings cited by Mintz Levin "only disclose the general topics and timing—not the substance—of Greenberg's advice."  *Id*.  In paragraph 82 of the Amended Complaint, Neogenix states only that it had obtained advice with

17

respect to the "impropriety and risks of the Finder Fee Program in early 2011." *Id.* (quoting Am. Compl. ¶ 82).  Paragraph 162 of the original Complaint (now removed from the Amended Complaint) stated that Neogenix became "aware of potential claims relating to the Finder Fee Program or facts that would leave a reasonable person to discover those claims" after conferring with counsel in early 2011." *Id.* (quoting Compl. ¶ 162).  Since no substantive communications were revealed, Neogenix argues that there was no subject-matter waiver.  *Id.*

Having reviewed the three categories of disclosures cited above (*e.g.*, letters to the SEC, letters to shareholders, and the instant pleadings), the Court finds that Neogenix did not intentionally waive its attorney-client privilege regarding communications with successor counsel Greenberg Traurig or Nelson Mullins.  Neogenix's waiver of the attorney-client privilege in its August 15 and November 1, 2012 letters to the SEC was intended to be limited in nature and was responsive solely to an inquiry made by the Commission.  *See* DE 49-1, DE 49-2.  For example, in the August 15, 2012 letter, Neogenix wrote that it has "agreed to waive its attorney client privilege concerning the issue of Finders and is providing a memorandum from Mintz Levin to Peter Gordon, dated April 11, 2005…" DE 49-1 at 1.  As counsel for Neogenix pointed out, "this is the only document we are aware of that is responsive to your inquiry." *Id.*  Neogenix urged that "this letter and the documents produced be maintained in confidence by the SEC and its staff and used solely for the purpose of the SEC's inquiry." *Id.*  Similarly, with respect to the November 1, 2012 letter to the SEC, Neogenix informed the Commission that after concluding a review of documents withheld pursuant to the attorney-client privilege and/or work-product privilege, "no further emails or other documents relating to legal advice concerning the payment of Finders" were found.  *See* DE 49-2 at 1.  Again, Neogenix requested that the letter and the documents produced therein be

maintained in confidence by the SEC and its staff and "used solely for the purpose of the SEC's inquiry." *Id*.

By way of illustration, the court in *TIG Ins. Co.*, a legal malpractice action, held that plaintiff's execution of a stipulated protective order when read "in context" amounted to a waiver over only privileged communications and documents pertaining to its attorney-client relationship with the defendant law firm and did not extend to a waiver of the privilege with successor counsel who continued to represent the plaintiff in the malpractice action. *See TIG Ins. Co. v. Yules & Yules*, No. 99 Civ. 3378, 1999 WL 1029712, at *4 (S.D.N.Y. Nov. 12, 1999). While the Court recognizes that successor counsel Greenberg Traurig and Nelson Mullins are not representing Neogenix as counsel of record in the instant malpractice action, the Court nonetheless finds instructive the principle set forth in *TIG Ins. Co.* that waivers of the sacrosanct attorney-client privilege should be strictly construed in context. As to the stipulated protective order in *TIG*, the court observed that "in context it is obvious that the stipulation was addressed to the production of documents in the files of the various defendants, all of whom had served as attorneys for plaintiff at one time or another" - - and not successor counsel. *TIG Ins. Co*., 1999 WL 1029712, at *4. "The plaintiff expressly agreed in the stipulation that it would 'waive any claim or right it may have against the defendants for release and or production of documents in the above-entitled litigation, and consents to the production of all documents and things from the defendants' files in accordance with Clause 1 through 5 of the agreement.'" *Id*. (quoting Stipulation at p. 1). As the court pointed out, the defendants cited "in isolation" the "immediately following sentence concerning plaintiff's waiver of the privilege" which the court found did not, when read in context,

19

constitute plaintiff's "waiver of its privilege for communications" with non-party successor

counsel. *Id.*

Next, the Court acknowledges that Neogenix disclosed in both its letters to shareholders

and the pleadings in the instant action that its decision to suspend the Finder Fee Program was

based on advice received from successor counsel. However, the substance of those attorney-client

communications was never disclosed. For example, in a March 6, 2012 letter to shareholders,

Neogenix stated that

> [i]n our submissions to the SEC, the Company and its legal counsel
> have explained that the policy of paying finders fees to unlicensed
> parties were initiated and managed by a former officer and Director
> of the Company. We also explained that the Company's prior
> outside legal counsel had not informed the Board of the rules and
> restrictions on payment of fees to unlicensed finders or advised that
> the Company's use of compensated, unlicensed finders could subject
> it to material legal risks. In 2011 the Company hired new legal
> counsel who advised the Board and management of those legal
> requirements. With that knowledge, the Board and Company's
> management took steps to discontinue this practice of engaging
> unlicensed finders to raise funds.

DE 49-3 at 2. This statement summarizes the interaction between Neogenix and the SEC at the

relevant time. It does not provide any particular statements legal counsel made to the SEC, nor

does it state what exactly was said to the Board.

Subsequently, in a June 29, 2012 letter to shareholders, Neogenix stated that "[o]n advice

of new counsel, in 2011 we discontinued paying unlicensed finders for raising investment funds."

DE 49-4 at 2. Neogenix does not set forth exactly what the advice of counsel was or the substance

of any specific opinion rendered by new counsel. Finally, in its August 8, 2012 letter to

shareholders, Neogenix explained, *inter alia,* the possibility that "some shareholders who bought

their Neogenix shares from unlicensed finders who were paid a commission may have rescission

20

rights under the laws of their state." DE 49-1 at 5. As noted "[t]hose positions are based on extensive legal analyses performed by our outside counsel, Greenberg Traurig, a well-respected firm with expertise in this area." *Id.* In all of these letters, Neogenix notes that it merely relied on the advice of successor counsel without disclosing the actual communications which transpired. Similarly, the two allegations in the original and amended pleading cited by Defendants simply stated the chronology of when outside counsel was retained and the actions taken by Neogenix shortly after the engagement. *See* Am. Compl. ¶ 82; Compl. ¶ 162.

If the disclosure does not reveal the substance of the communication, a court will not find a subject-matter waiver. *See Nycomed U.S. Inc. v. Glenmark Generics Ltd.*, No. 08 Civ. 5023, 2009 WL 3334365, at *3 (E.D.N.Y. Oct. 14, 2009) (dismissing subject-matter waiver argument based on testimony referencing defense strategies developed in consultation with counsel since such testimony did not reveal the substance of the communications); *In re MetLife Demutualization Litig.,* No. 00 Civ. 2258, 2007 WL 1017603, at *7-8 (E.D.N.Y. Mar. 30, 2007) ("A party waives the attorney-client privilege with respect to a certain subject matter when that party places otherwise privileged communications "at issue" in the litigation; however, that rule "does not come into play when ... the privilege-holder ... has made extrajudicial disclosures.") *rev'd in part on other grounds*, 495 F. Supp. 2d 310 (E.D.N.Y. 2007), *rev'd by Murray v. Metropolitan Life Insurance Co.*, 583 F.3d 173 (2d Cir. 2009); *Weizmann Institute of Science v. Neschis*, No. 00 Civ. 7850, 2004 WL 540480, at *4 (S.D.N.Y. Mar. 17, 2004) (noting rule that privilege not waived where attorney-client relationship not affirmatively placed at issue); *United States v. McDonald*, No. 01 Civ. 1168, 2002 WL 31956106, at *3 (E.D.N.Y. May 9, 2002) (finding no waiver where defendant "did not reveal the substance of counsel's advice; rather, he indicated only that [the

21

entity] was formed on the advice of counsel."). In *AP Links*, for example, a non-party in a contract dispute testified that the defendant law firm "advised him" that the contract was usurious, and admitted that certain sworn statements were part of a legal strategy. *AP Links*, 2012 WL 3096024, at *5. On that basis, the plaintiffs claimed that the non-party had waived the attorney-client privilege as to communications with the defendant law firm regarding the same subject matter. This Court found that the testimony "[did] not contain any substance of the attorney-client communications which would enable a broader subject-matter waiver" of all the communications at issue. *Id.* (citing *Nycomed U.S. Inc.*, 2009 WL 3334365, at *3 and *McDonald*, 2002 WL 31956106, at *3). The plaintiffs' claim of subject-matter waiver was thus rejected. *Id.* The Court finds that the same principles apply to the circumstances of this case.

Accordingly, the Court finds that Neogenix did not intentionally waive its attorney-client privilege regarding communications with successor counsel Greenberg Traurig and Nelson Mullins. As discussed below, even assuming that there has been a waiver, Defendants fail to show that the interest of fairness requires that the disclosed and undisclosed materials ought to be considered together.

### 2. *Whether the Disclosed and Undisclosed Communications or Information Concern the Same Subject Matter*

Under the second prong of Rule 502(a), Mintz Levin argues that the documents Neogenix continues to withhold on the basis of privilege concern the same subject matter as those privileged materials that it has intentionally disclosed to the SEC. DE 49. Specifically, Mintz Levin seeks to compel disclosure of "all communications between it and Greenberg Traurig and/or its SEC counsel, Nelson Mullins, concerning: the payment of finders' fees to unlicensed finders; rights of rescission; defenses to any potential rescission claims; and strategies that could, or were, employed

to deal with potential rescission rights." *Id*. at 2-3.  Mintz Levin claims that these documents

involve the "same subject matter" as the documents and advice that Neogenix has already

disclosed voluntarily to the SEC concerning rescission or the payment to finders.  *Id*. at 3.

Because Plaintiff's counsel does not dispute the overlap present in the subject matter of the

disclosed and undisclosed discovery materials, the Court need not provide further analysis on this

prong of the test to determine if there has been a subject-matter waiver of attorney-client privilege.

### 3.    *Whether the Disclosed and Undisclosed Communication Ought in Fairness be Considered Together*

Pursuant to Fed. R. Evid. 502(a)(3), Defendant Mintz Levin argues that fairness requires

Plaintiff to disclose its communications and related discovery concerning its consultations about

the Finder Fee Program with successor counsel.  DE 49 at 3.  In particular, Mintz Levin contends

that Plaintiff is using the attorney-client privilege as a "shield and a sword" in an effort to prevent

Defendants from properly defending themselves in this case.  *Id*.  Moreover, Mintz Levin claims

that "early discovery suggests that Neogenix continued to pay finders' fees even *after* it received

advice on that subject from Greenberg Traurig."  *Id*. (citing DE 49, Ex. F) (emphasis in original).

If these findings were proven correct, then Neogenix would be unable to claim legal malpractice if

it "continued to do the very thing it alleges that it would have ceased doing, if it had been so

advised by prior counsel."  *Id*.  Based on the foregoing premise, Mintz Levin asserts that it is

"entitled to know whether Greenberg Traurig's advice is fairly and completely depicted in the

Complaint, and what Neogenix did (or didn't do) as a result of Greenberg Traurig's advice."  *Id*.

In the letter filed by Nixon Peabody in support of the Mintz Levin motion, Nixon Peabody

argues that Neogenix has placed "at issue" the legal advice rendered by successor counsel

regarding the Finder Fee Program.  DE 52 at 2.  Specifically, Neogenix maintains that Defendants

Mintz Levin, Nixon Peabody, and Neogenix Chief Legal Officer, Daniel Scher, committed legal malpractice in failing to advise the Neogenix Board that paying finder fees to unlicensed individuals who procured investments on behalf of the company violated securities laws and could lead to rescission liability. *Id*. at 1. As such, Nixon Peabody claims "the advice that Neogenix received from Greenberg or Nelson on the exact same issues—namely, the propriety and consequences of the Finder Fee Program—is not subject to the attorney-client privilege and is discoverable in this action." *Id*. at 2.

Second, Nixon Peabody claims, like Mintz Levin, that "[a]ny materials, communications, or advice prepared as part of Greenberg's internal investigation into the Finder Fee Program are not privileged for the additional reason that Neogenix is relying on the results of the internal investigation to prove the causation element of its malpractice claim." *Id*. at 2. In short, Nixon Peabody argues that Neogenix relied on Greenberg Traurig's advice that the Finder Fee Program (1) was categorically illegal and (2) exposed Neogenix to "'massive potential rescission" liabilities to establish that the attorney-defendants' advice about the Finder Fee Program caused Neogenix's injuries. *Id*. at 3. According to counsel for Nixon Peabody, Neogenix's reliance on the assertion that the Finder Fee Program was illegal and created massive liability requiring "crippling disclosures" in support of its legal malpractice claim, while denying Defendants the ability to access this very advice, undermines fairness. *Id*. Nixon Peabody therefore requests that the Court issue an Order directing Neogenix to disclose "(1) the substance of Greenberg's advice regarding the propriety and consequences of the Finder Fee Program; (2) Neogenix's characterization of, and reliance on, that advice; and (3) the degree to which the advice actually caused or necessitated the various business decisions and failures that proximately caused Neogenix's bankruptcy." *Id*.

Even assuming that there was a subject-matter waiver, Neogenix argues that fairness does not mandate disclosure here.  DE 64 at 2.  Neogenix wrongly contends that the letters to the SEC and to shareholders constituted "extrajudicial disclosures" which "do not implicate the legal prejudice the fairness doctrine is designed to prevent."  *Id*. at 3 (quoting *In re MetLife Demutualization Litig.,* 2007 WL 1017603, at *8).  However, since the SEC proceeding was adversarial in nature, these disclosures were *not* "extrajudicial."  *In re von Bulow,* 828 F.2d 94, 102 (2d Cir. 1987) ("[W]e hold therefore that the extrajudicial disclosure of an attorney-client communication-one not subsequently used by the client in a judicial proceeding to his adversary's prejudice—does not waive the privilege as to the undisclosed portions of the communication."); *see also In re Kidder Peabody Secs. Litig.,* 168 F.R.D. 459, 470 (S.D.N.Y.1996) (finding a waiver where the defendant "invoked [an attorney-created investigative] report and its conclusions ... both in judicial fora and in other judicial-type contexts).  Moreover, Neogenix claims that the two allegations at issue in the pleadings "neither establish nor will be used to establish the defendants' wrongdoing or the impropriety of the Finder Fee Program."  *Id*.  Rather, Neogenix argues, these allegations relate to the timing of when Neogenix learned of the potential issues with the Finder Fee Program for "purposes of the discovery rule, on which Neogenix no longer relies."  *Id*.  In any event, in contrast to the original Complaint, the Amended Complaint no longer relies on the "discovery rule," which is necessary in order to state a claim for breach of fiduciary duty.  *Id*. at 3 n.2; *Matana v. Merkin*, 957 F.Supp.2d 473, 492 (S.D.N.Y. July 30, 2013) (explaining that under New York law, where a breach of fiduciary duty claim is based on an allegation of fraud, the six-year statute of limitations applies, along with its two-year discovery rule").

The operative pleading now asserts a cause of action for breach of fiduciary duty by fraudulent concealment, which has a "longer limitations period and does not hinge on the discovery rule here."  DE 64 at 3 n.2 (comparing Compl. ¶¶ 116-26, *with* Am. Compl. ¶¶ 126-37). Finally, Neogenix takes issue with Defendants' contention that principles of "but-for causation" require a "broader waiver."  *Id*.  According to Neogenix, Mintz Levin already has access to information germane to the issue of causation, namely, (1) Neogenix's discontinuance of the Finder Fee Program on Greenberg's advice in early 2011, and (2) Neogenix's payment of some finder fees later in 2011 (solely with respect to investments executed prior to Greenberg's engagement).  *Id*.  Neogenix adds, ultimately, that Mintz Levin is "free to take discovery as to what Neogenix did (or didn't do) after retaining Greenberg."  *Id*.

"Like the Second Circuit, New York courts will not find an at issue waiver merely because privileged information is relevant to the issues being litigated; [r]ather, at issue waiver occurs when the party has asserted a claim or defense that he intends to prove by use of the privileged materials, or, where rather than being merely relevant, the privileged documents are indispensable to a party's claims or defenses."  *Leviton Mfg. Co., Inc. v. Greenberg Traurig LLP*, No. 09 Civ. 8083, 2010 WL 4983183, at *4 (S.D.N.Y. Dec. 6, 2010) (citing *Chin v. Rogoff & Co., P.C.*, No. 05 Civ. 8360, 2008 WL 2073934, at *5 (S.D.N.Y. May 8, 2008) and *Carl v. Cohen*, 23 Misc.3d 1110(A), 886 N.Y.S.2d 66 (Table), 2009 WL 997517, at *3 (S.Ct. N.Y. Cty. 2009)).  The court in *Leviton* noted further that "where a claim of malpractice is premised upon reliance on the erroneous advice of predecessor counsel, under both New York and federal law, the legal advice received from any other counsel on the same issue is placed at issue."  *Id*. (citations omitted). "The attorney-client privilege may be waived 'when the defendant asserts a claim that in fairness

26

requires examination of protected communications.'" *S.E.C. v. Carrillo Huettel LLP*, No. 13 Civ.

1735, 2015 WL 1610282, at *5 (S.D.N.Y. Apr. 8, 2015) (quoting *United States v. Bilzerian,* 926

F.2d 1285, 1292 (2d Cir. 1991)).  "The key to a finding of implied waiver ... is some showing by

the party arguing for a waiver that the opposing party *relies* on the privileged communication as a

claim or defense or as an element of a claim or defense." *Id*. (quoting *County of Erie,* 546 F.3d at

228) (emphasis in original).  Apart from speculative assertions, Defendants have failed to convince

the Court that Neogenix is relying on privileged communications to pursue its claims in this

matter.

Moreover, the Court is not persuaded that disclosure of successor counsel's legal advice to

Neogenix is indispensable to the defenses of Mintz Levin, Nixon Peabody and Daniel Scher.

Neogenix, as this Court held earlier, did not intentionally waive its attorney-client privilege.

However, even if there had been a waiver of successor counsel's communications and information,

the Defendants have at their disposal other evidence to defend themselves against the claims of

legal malpractice which are relevant to the issue of but-for causation.  For example, as Mintz Levin

concedes, early discovery suggests that Neogenix continued to pay finders even after receiving the

correct legal advice from Greenberg Traurig in 2011.  *See* DE 49 at 3.  Likewise, discovery

remains open and counsel have yet to complete depositions which will provide Defendants with

opportunities to pursue questioning to uncover facts on this particular issue as well as all of the

other facets of Neogenix's legal malpractice claims.  The purported necessity of Mintz Levin's

ability to review Neogenix's communications with successor counsel is further undermined by the

fact that Neogenix has removed from the pleadings the claim for legal malpractice against Mintz

Levin.

Further, "[s]imply because those communications might be useful in undermining [Neogenix's] explanation does not mean that the attorney-client privilege has been impliedly waived.  To conclude otherwise would require an implied waiver of privilege in any legal malpractice action in which the defendant attorney challenged causation and claimed that the former client had available, through successor counsel, alternative courses of action to avoid the consequences of his malpractice."  *Leviton Mfg. Co.,* 2010 WL 4983183, at *6 (citing *Jakobleff v. Cerrato, Sweeney and Conn,* 97 A.D.2d 834, 835, 468 N.Y.S.2d 895 (2d Dep't 1983)); *see also Weber v. Res. Training Ctr., Inc.,* 2014 U.S. Dist. LEXIS 176848, at *3 (E.D.N.Y. Dec. 23, 2014) ("Defendants assert as well that the records plaintiff claims are privileged include references to her employment by defendants and even refer to individual defendants by name…This argument establishes only that the records are relevant; it does not establish that plaintiff has put their contents at issue or otherwise waived her privilege. Indeed, as noted above, even communications that might contradict positions taken by a party do not as a result lose their privileged status.)"   In *Leviton*, the court held that a defendant law firm (coincidentally, Greenberg Traurig) in a legal malpractice action that was alleged to have failed to timely file a patent application was not entitled to the plaintiff/ex-client's confidential communications with successor counsel but was "free to attempt to demonstrate that factors other than its failure to timely file the patent applications resulting in the loss of the economic value of the patents."  *Leviton Mfg. Co.,* 2010 WL 4983183, at *8.  Similarly here, the Court finds that Defendants can pursue other areas of discovery to establish their defense against claims of legal malpractice.  Consequently, the Court finds that this is not a case where Neogenix is using the privileged materials as both a "shield and a sword."

In *In re Cnty. of Erie*, the Second Circuit held that "a party must *rely* on privileged advice from his counsel to make his claim or defense."  546 F.3d 222, 229 (2d Cir. 2008) (emphasis in original).  In doing so, the Second Circuit declined to "specify or speculate as to what degree of reliance is required."  *Id.*  Importantly, the court observed that "privileged information may be in some sense relevant in any lawsuit.  A mere indication of a claim or defense certainly is insufficient to place legal advice at issue."  *Id.*  The Defendants here have not proven to the Court that access to the privileged materials sought is necessary to defend against the claims of legal malpractice asserted by Neogenix.  Should information arise during the course of depositions which impacts this finding, the Defendants are free to make an application to the Court.

Finally, the Court finds unpersuasive Nixon Peabody's reliance on *Bank Brussels Lambert v. Credit Lyonnais (Suisse), S.A.,* 210 F.R.D. 506 (S.D.N.Y. 2002) to support its argument that Plaintiff is relying on an assertion of fact while denying Defendants access to privileged material to potentially rebut such assertion.  As Judge Francis has pointed out, *Bank Brussels* pre-dates the Second Circuit's decision in *Cnty. of Erie*.  In addition, that case involved a malpractice action against a law firm, where its representation of the client overlapped and was simultaneous with another firm's representation of that client in the same matter.  *See Shaub and Williams, L.L.P. v. Augme Technologies, Inc.* 2014 WL 1033862 (S.D.N.Y. Mar. 17, 2014).  "Additionally, the plaintiff in that case relied on its in-house counsel and current outside counsel to interpret the work done by its former counsel (the defendant), all of whom were providing legal analyses and advice to the plaintiff at the same time." *Id.* (citation omitted).  The circumstances of *Bank Brussels*, therefore, are distinct from those underlying the instant action.

29

Accordingly, the Court finds that the fairness argument here does not compel the conclusion that the disclosed and undisclosed communications must be considered together.

## IV.     CONCLUSION

For the foregoing reasons, the Court hereby DENIES Mintz Levin's motion to compel disclosure of Neogenix's communications and work-product with successor counsel Greenberg Traurig and Nelson Mullins.


                                              **SO ORDERED.**

Dated:  Central Islip, New York
        July 31, 2015

                                              /s/ A. Kathleen Tomlinson
                                              A. KATHLEEN TOMLINSON
                                              U.S. Magistrate Judge