**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
NEOGENIX ONCOLOGY, INC.,

|  | **MEMORANDUM** |
| --- | --- |
| Plaintiff, | **AND ORDER** |
| -against- | CV 14-4427 (JFB) (AKT) |

PETER GORDON, MINTZ LEVIN COHN
FERRIS GLOVSKY and POPEO P.C.,
NIXON PEABODY LLP, DANIEL J. SCHER,
HARRY GURWITCH, and MAIE LEWIS, not
individually but as personal representative of the
Estate of BRIAN LEWIS,

                                    Defendants.
------------------------------------------------------------X

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.     P<small>RELIMINARY</small> S<small>TATEMENT</small>

        This case involves claims for breach of fiduciary duty and legal malpractice primarily

against former law firms and attorneys who provided services to Neogenix Oncology, Inc.

("Plaintiff" or "Neogenix").  Neogenix is "a publicly reporting biotechnology company focused

on developing genetically engineered cancer treatments." *See* Amended Complaint ("Am.

Compl.") ¶ 1 [DE 35].  Neogenix alleges that Defendants Peter Gordon, the law firms of Mintz,

Levin, Cohn, Ferris, Glovsky, and Popeo, P.C. and Nixon Peabody LLP, Daniel J. Scher, Harry

Gurwitch, the Estate of John Squire, and Maie Lewis (not individually, but as personal

representative of the Estate of Brian Lewis) (collectively, the "Defendants"), orchestrated a

"cover up" which "prompted an SEC investigation" and ultimately forced Neogenix to "file for

bankruptcy and sell its assets under court supervision." *Id.* ¶ 3.

Specifically, as part of an effort to raise money for Neogenix, the former Chief Financial Officer of the company, Defendant Peter Gordon, initiated the Finder Fee Program, under which Neogenix paid commissions to anyone who brokered a sale of Neogenix stock, regardless of whether those persons were registered with the Securities and Exchange Commission ("SEC"). *Id*. ¶¶ 25-26. Neogenix claims that at the time, it did not know that the Finder Fee Program violated the Securities Exchange Act of 1934, which essentially prohibits anyone from selling securities without first being registered with the SEC, and, in turn, bars a company from compensating these unlicensed brokers. *Id.* ¶ 29. As a result, Neogenix brought this suit against (1) its former Chief Financial Officer for breach of fiduciary duty in instituting the unlawful Finder Fee Program, and (2) all former counsel, chiefly Mintz Levin Cohn Ferris Glovsky and Popeo P.C. ("Mintz Levin"), for legal malpractice by allegedly failing to provide proper and timely legal advice with regard to the unlawful Finder Fee Program. *See generally id.*

Pending before the Court is a motion filed by Mintz Levin ("Defendant" or "Mintz Levin") seeking to compel non-party Precision Biologics, Inc. ("Precision") to comply with a subpoena seeking documents and testimony ("the Subpoena") served on Precision on December 8, 2015. *See generally* DE 165 (Mintz Levin's Notice of Motion to Compel Compliance with Subpoena Served on Precision Biologics, Inc.). Non-party Precision opposes enforcement of the Subpoena primarily on grounds of relevance.[1] *See* DE 166. For the reasons set forth below, the Court DENIES Mintz Levin's motion to compel compliance with the Subpoena served upon Precision.

---

[1]     The Court treats the objections raised by Precision as a cross-motion to quash the subpoena pursuant to Rule 45(d)(3) of the Federal Rules of Civil Procedure.

II.    **BACKGROUND**

   **A.  Facts Relevant to the Current Motion[2]**

   Because this motion bears upon facts involving Neogenix's Chapter 11 Bankruptcy, including non-party Precision's stalking horse bid and successful purchase of Neogenix's operating assets, the Court begins with a brief factual summary in order to frame its analysis.

   *1.  Plaintiff's Formation and Financial Model*

   Neogenix was founded in 2003 as a "clinical stage, pre-revenue generating, biotechnology company focused on developing therapeutic and diagnostic products for the early detection and treatment of cancer."  Bates Decl., Ex. 5 at 20.  Although it initially focused its research efforts on therapeutic and diagnostic products aimed at pancreatic and colorectal cancers, Neogenix "believed its approach and portfolio of three unique monoclonal antibody therapeutics held the potential for novel and targeted therapeutics and diagnostics for the treatment of a broad range of tumor malignancies."  *Id.*

   As a "development stage bio-tech company," Neogenix did not generate any revenue from either product sales or operations.  *Id*. at 22.  Rather, it primarily funded its operations through the sale of common stock as well as from interest obtained from funds invested in bank Certificates of Deposit.  *Id*. at 23.  Specifically, "certain shares of the common stock were, at the direction of prior management and upon the advice of the Company's prior counsel, sold through unlicensed compensated finders" which Neogenix asserts "later hinder[ed] [its] ability to raise capital."  *Id*.  As of July 9, 2012, Neogenix had a total of 22,924,419 shares of common stock

---

[2]    The facts are drawn primarily from Neogenix's Second Amended Disclosure Statement with Respect to Neogenix Oncology's Second Amended Plan of Liquidation, attached as Exhibit ("Ex.") 5 to the March 28, 2016 Declaration of Jeremy C. Bates in Support of Defendant Mintz, Levin, Cohn, Ferris, Clovsky and Popeo, P.C.'s Motion to Compel Compliance with Subpoena Served on Precision Biologics, Inc. ("Bates Decl.").

outstanding with approximately 942 shareholders of record.  *Id*.  In addition, as of December 31, 2011, Neogenix had approximately 16,147,000 shares of common stock issuable based upon outstanding stock options and warrants.  *Id*.

## 2. *Events Resulting in Plaintiff's Chapter 11 Bankruptcy Filing*

Beginning in spring 2011, "Neogenix ascertained that based on the strategy implemented under the direction of prior management and the advice of the Company's prior counsel and outside advisors, Neogenix for years had engaged in the practice of paying finder fees to individuals and entities for raising capital for the Company[.]"  *Id*.  This "finders' fee" program entailed payments being made by Neogenix to third parties in connection with the sale of its common stock."  *Id*.  As part of this program, Neogenix was paying finders' fees to individuals and entities that it "had not confirmed were registered broker-dealers or otherwise properly licensed under applicable state law to participate in the sale of [ ] securities on a compensated basis."  *Id*.  Upon this "realization," and pursuant to "the advice of new outside counsel, the new management team [ ] promptly caused the company to discontinue its prior practice of using unlicensed compensated finders to sell common stock."  *Id*. at 24.

As a result of paying finders' fees to unlicensed individuals and entities in conjunction with the sale of its common stock, Neogenix was faced with the prospect that "at least some investors who purchased shares of common stock in transactions in which finders' fees were paid to unlicensed compensated finders may have the right to rescind their purchases of those shares."  *Id*.  As of July 10, 2012, Neogenix calculated its potential rescission liability to range from $0 to $31 million dollars, although as of that date it had already "received communications from several shareholders making requests or claims of rescission of investments in Neogenix's common stock totaling approximately $1.4 million."  *Id*.  However, "no litigation against

Neogenix has been initiated with respect to rescission of any Shareholder's investment." *Id.*
Notwithstanding the absence of any lawsuits seeking rescission, Neogenix asserts that "[i]f the
Company had been forced to rescind a significant number of share purchases and/or pay
substantial damages, it would have severely jeopardized [its] ability [ ] to continue [its] business
operations." *Id.* In addition, "this potential liability had a chilling effect on the Company's
ability to raise capital from investors." *Id.*

In October 2011, following its own realization that part of its finders' fee program had
potentially exposed it to legal ramifications, Neogenix received a letter of inquiry from the
Philadelphia Regional Office of the Securities and Exchange Commission ("SEC").[3] The letter
requested that Neogenix "provide certain information relating to payments made by Neogenix to
third parties (referred to as 'finders' fees') in connection with the sales of Neogenix's common
stock." *Id.* at 23. Although Neogenix fully cooperated with this inquiry, "a number of [its] SEC-
required filings were delayed." *Id.* at 23-24. Specifically, the SEC's inquiry resulted in a delay
in the filing of Neogenix's third quarter 2011 Form 10-Q as well as the "full year 2011 financial
statements based upon uncertainty regarding the appropriate accounting treatment to reflect the
potential rescission liability[.]" *Id.* at 24. Neogenix claims that the SEC's inquiry created an
additional "chilling effect" concerning its ability to actively raise capital through the sale of
common stock. *Id.* at 25.

In addition to these issues, Neogenix faced the prospect of extensive dilution due to the
16,147,000 outstanding stock options which, if exercised, "would have been highly dilutive to

---

[3]     Notwithstanding that its common stock is not traded on any exchange, based upon the
total number of its shareholders, Neogenix is regarded as a public reporting company under the
Securities Exchange Act of 1934 and is therefore required to make periodic filings with the SEC.
*Id.* at 23.

both the current and future shareholders, as such number of options represented nearly 72% of those shares already outstanding." *Id.* Thus, this "potential dilution" created an additional hindrance in "the Company's future ability to raise capital via what had been its primary source of financial support — the sale of its common stock." *Id.*

In light of these as well as other market factors, Neogenix was unable to raise the necessary operating capital it required through outside investment and so it turned instead to internal cost-cutting initiatives as well as evaluating strategic alternatives. *Id.* Specifically, between December 2011 and January 2012, both Neogenix's management and its Board of Directors (the "Board"), in conjunction with advice from its new outside counsel, "initiated an aggressive cash conservation program and began a series of cost cutting initiatives [while] at the same time, . . . evaluating various potential strategic alternatives available to the Company." *Id.* These efforts led to: (1) operational restructuring in order to "reduce cash outflows for general and administrative expenses through a combination of reductions in force and in compensation, restructuring of various contacts and leases and refocusing business strategies;" and (2) the formation of the Strategic Alternatives Committe ("SAC") which was "charged with the mission of exploring, in a thorough, thoughtful and deliberative manner, all of the strategic options and alternatives that were available to [Neogenix] to address the serious liquidity problems that [it] was facing, and to carefully evaluate the pros and cons of each potential strategic alternative." *Id.* at 26.

As a result of its operational restructuring, Neogenix was able to "stretch its remaining working capital for a much longer period of time than otherwise would have been possible, thereby giving [it] significant additional time to thoroughly, thoughtfully and deliberatively consider all of its strategic options." *Id.* at 25. In addition, as a result of the SAC's review, the

Board authorized the engagement of an investment banker and financial advisor in order to assist Neogenix in determining whether it could "raise the funds necessary to continue its on-going business operations in order to (1) preserve its therapeutic and diagnostic science and technology, and (2) maximize the value of [its] assets for the benefit of its shareholders, or, alternatively, accomplish these goals through a strategic chapter 11 bankruptcy filing in order to conduct a 363 sale of the Debtor's operating assets." *Id.* at 26.

During late February and early March 2012, the SAC recommended that the Board engage Piper Jaffray & Co. ("PJC") as Neogenix's investment banker to investigate its future potential to raise capital in order to sustain its business operations or, in the alternative, "search for a buyer of [its] operating assets." *Id.* The Board accepted the SAC's recommendation and from March 2012 through June 2012, PJC "contacted numerous parties to determine their interest in either investing in Neogenix or, acquiring [its] operating assets." *Id.* Specifically, PJC contacted a total of 59 potential suitors, of which 40 reviewed Neogenix's prospectus and/or "participated in high-level discussions about the transaction." *Id.* Ultimately, three interested parties negotiated confidentiality agreements and two of these parties participated in an initial telephone call with Neogenix's management and PJC to further explore this business opportunity. *Id.*

Despite PJC's efforts, "the only party to submit a bid for [Neogenix's] operating assets was Precision Biologics." *Id.* at 27. Through its receipt of post-marketing feedback, PJC ascertained that many parties which had initially expressed interest ultimately dropped out "because the stage of [Neogenix's] development was too early to determine the efficacy and commercialization potential of its drugs, and because [it] had an unproven track record." *Id.*

Rather, it appeared that "the market generally believed that a company like [Neogenix] was much more suitable for investment or sale after completing Phase 2 clinical trials." *Id*.

### 3. *Stalking Horse Bid by Precision Biologics*

Precision Biologics ("Precision") is a corporate entity which was formed "specifically for the purpose of purchasing [Neogenix's] assets and was initially owned and managed by its founder, Stanley B. Archibald, Jr., who is both a shareholder of Neogenix as well as a former member of [its Board.]" *Id*. In early February 2012, after having served as a Board member for approximately seven months, Mr. Archibald resigned "in order to explore the potential viability of raising money and forming a new company to buy [Neogenix's] operating assets through a strategic chapter 11 bankruptcy filing and a 363 sale process." *Id*. After obtaining "sufficient financial support from a targeted group of other Neogenix shareholders," Precision began "substantive discussions with Neogenix regarding the potential acquisition of Neogenix's operating assets." *Id*. Precision's interest in acquiring Neogenix's operating assets stemmed from its desire to "continue development of [Neogenix's] therapeutic and diagnostic products without being burdened by the SEC Inquiry, the contingent rescission liability or the highly dilutive stock operation overhand and, therefore, with the ability to continue to raise funds to support future business operations." *Id*. In short, this arrangement would enable Precision to "provide an attractive revitalized capital structure that would appeal to new shareholders and investors." *Id*.

After raising a sufficient amount of capital to make a comprehensive bid for Neogenix's operating assets, Precision and Neogenix entered into an Asset Purchase Agreement ("APA") in

July 2012. As such, Precision effectively assumed the role of the "stalking horse bidder."[4]

Precision's stalking horse bid was comprised of "(a) $3,325,000 of cash (including purchase price adjustments) and $730,000 of contingent cash to fund (1) [Neogenix's] on-going business operations through the close of the sale and (2) the bankruptcy process until the bankruptcy process is completed, (b) 5.5 million shares of Precision Biologics stock, and (3) rights to purchase an additional 5 million shares of Precision Biologics stock at $1.50 per share." *Id*. at 28. Thereafter, on July 18, 2012, after extensive further deliberations, Neogenix's Board determined that "the most effective way to preserve Neogenix's therapeutic and diagnostic sciences and to maximize the value of [its] assets for the benefit of [its] shareholders was to seek bankruptcy protection in order to sell [its] operating assets through a sale pursuant to section 363 of the Bankruptcy Code to Precision Biologics, pursuant to the terms of the APA, subject to higher and better offers through a bankruptcy court authorized public sale process." *Id*. Two additional components of the stalking horse bid included a pre-petition bridge loan in the principal amount of $640,697 plus interest and fees and a Debtor-in-Possession ("DIP") financing loan, "which purpose was to provide [Neogenix] with the funds necessary to (1) continue its on-going business operations . . . and (2) fund [its] bankruptcy case until the bankruptcy process is completed." *Id*. at 29.

---

[4] "A stalking horse bidder in a bankruptcy proceeding makes an initial bid to purchase the assets of a debtor on the theory that the initial bidder's 'initial research, due diligence, and subsequent bid may encourage later bidders.'" *In re MSR Resort Golf Course LLC*, No. 13 CIV. 2448, 2014 WL 67364, at *2 n. 3 (S.D.N.Y. Jan. 7, 2014) (quoting *In re 310 Associates*, 346 F.3d 31, 34 (2d Cir. 2003)). "Stalking horse bidders often contract to receive a 'break-up fee' compensating it for its bidding activities should a higher bid ultimately emerge and win an eventual asset auction." *Id*.; *see In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992).

### 4. *Filing of the Bankruptcy Petition and Ultimate Asset Sale to Precision Biologics*

On July 22, 2012, Neogenix's Board "approved the APA and the DIP Loan Agreement and authorized the filing of [a] Chapter 11 Case." *Id*. at 30. As such, on July 23, 2012, Neogenix filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. *Id*.[5] Thereafter, on August 21, 2012, the court entered an order approving the proposed Sale and Bid Procedures ("Sale Order"). *Id*. In accordance with Sale Order, PJC "re-contacted the fifty-nine (59) potential bidders from the pre-petition process, as well as eleven (11) additional potential bidders identified by PJC and nine (9) additional potential bidders identified by the Official Committee's financial advisor." *Id*. at 35-36. Despite these further marketing efforts, no qualified bids, other than the APA between Precision and Neogenix, were received by either the bid deadline or the extended bid deadline. *Id*. at 36. As such, the auction was cancelled and Precision was determined to be the successful bidder. *Id*. at 36-37.

 Following Precision's successful bid, the court held a Sale Hearing on September 20, 2012, and entered a Final Order approving the sale of Neogenix's operating assets to Precision pursuant to § 363 of the Bankruptcy Code and in accordance with the terms of the APA, as amended on August 31, 2012 and September 20, 2012. *Id*. at 37. Specifically, the court determined, in part, that

> The Debtor [Neogenix] has demonstrated a sufficient basis and compelling circumstances requiring it to enter into the Agreement, sell the Acquired Assets and assume and assign the Acquired Contracts under section 363 and 365 of the Bankruptcy Code prior to confirmation of a plan of reorganization under section 1129 of the Bankruptcy Code, and such actions are appropriate exercises of the Debtor's business judgment and in the best interests of the Debtor,

---

[5]     Neogenix currently maintains possession of its property and manages its business affairs as a debtor-in-possession, in accordance with §§ 1107 and 1108 of the Bankruptcy Code. *Id*. at 30.

its estate, and its shareholders. Such business reasons include, but are not limited to, the fact that (i) there is substantial risk of deterioration of the value of the Acquired Assets if the Sale is not consummated quickly; (ii) the Agreement constitutes the highest or best offer for the Acquired Assets; (iii) the Agreement and the Closing will present the best opportunity to realize the value of the Debtor on a going-concern basis and avoid decline in the Debtor's business; and (iv) unless the Sale is concluded expeditiously as provided for in the Sale Motion and pursuant to the Agreement, creditors' (if any) and shareholders' recoveries will be significantly diminished.

The Bid Procedures set forth in the Bid Procedures Order were non-collusive, created and followed in good faith, and substantively and procedurally fair to all parties. The Purchaser is the Successful Bidder for the Acquired Assets in accordance with the Bid Procedures Order. The Bid Procedures enabled the Debtor to obtain the highest and best value for the Acquired Assets for the Debtor and its estate.

The Debtor and its professionals have complied, in good faith, with the Bid Procedures Order in all respects. As demonstrated by (a) any testimony and other evidence proffered or adduced at the Sale Hearing or submitted by affidavit or declaration at or prior to the Sale Hearing and (b) the representations of counsel made on the record at the Sale Hearing, through marketing efforts and a competitive sale process conducted in accordance with the Bid Procedures Order, the Debtor (i) afforded interested potential purchasers a full, fair and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase all of the Debtor's assets; (ii) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Acquired Assets; and (iii) considered all Qualified Bids submitted on or before the Bid Deadline.

\*\*\*

The Purchaser is a buyer in good faith, as that term is used in the Bankruptcy Code and the decisions thereunder, and is entitled to the protections of section 363(m) of the Bankruptcy Code with respect to all of the Acquired Assets and the relief provided for in the Order. The Agreement was negotiated at arm's length and entered into in good faith and without collusion or fraud of any kind. The Purchaser has not engaged in collusion or any conduct that would otherwise control or tend to control the sale price as between or among

potential bidders and, therefore, has not violated section 363(n) of the Bankruptcy Code. Neither the Debtor nor the Purchaser have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code; or cause the application of or implicate section 363(n) of the Bankruptcy Code to the Agreement or to the consummation of the Sale and transfer of the Acquired Assets and the Acquired Contracts to the Purchaser. The Purchaser has complied in good faith with the Bid Procedures Order in all material respects. The Purchaser is entitled to all of the protections and immunities of section 363(m) of the Bankruptcy Code.

Bates Decl., Ex.10 (Order Approving Asset Purchase Agreement).

On September 24, 2012, Neogenix and Precision closed on the sale with the result that "all of the Debtor's rights, title, and interests in its operating assets, including without limitation, its patents, office equipment, and laboratory equipment, were transferred to Precision Biologics.[6] In return, and consistent with the terms of the APA, as subsequently amended, Precision Biologics paid the Debtor $3,965,000.00, minus a credit of $1,172,525,37 representing payoff and full satisfaction of the DIP Financing Facility. The remaining proceeds of $2,792,474.63 went to the Debtor." *Id.*, Ex. 5 at 37. In addition to the cash component of the asset purchase, Precision also issued 5.5 million shares of Precision common stock to be distributed to Neogenix's shareholders on a pro rata basis. *Id.* Further, pursuant to the terms of the APA, Neogenix agreed to repay Precision $730,000 in Contingent Cash plus interest compounded annually at 12% per annum out of any proceeds received by the Debtor from the Existing Claims, as defined in the APA, after payment of certain fees and repayment of the DIP financing. *Id.*

---

[6] Specifically, these operating assets included: (1) Acquired Contracts; (2) Inventory; (3) Equipment; (4) Files and Records; (5) Permits; (6) Intellectual Property; (7) Leasehold Properties; (8) Goodwill; (9) Receivables; and (10) Deposits. Bates Decl., Ex. 12(E) (July 23, 2012 Asset Purchase Agreement between Neogenix and Precision).

## III.  DISCUSSION

### A.  Applicable Legal Standards

Rule 45 of the Federal Rules of Civil Procedure governs the procedure when an individual or entity seeks to quash or modify a subpoena.[7]  Specifically, Rule 45(d) provides, in pertinent part, that

> (A) *When Required*. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
> (i) fails to allow a reasonable time to comply;
> (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
> (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
> (iv) subjects a person to undue burden.
>
> (B) *When Permitted*. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
> (i) disclosing a trade secret or other confidential research, development, or commercial information; or
> (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

Fed. R. Civ. P. 45(d)(3)(A), (B).

"A determination to grant or deny . . . a motion to quash a subpoena is discretionary."

*John Wiley & Sons, Inc. v. Doe Nos. 1-30*, 284 F.R.D. 185, 189 (S.D.N.Y. 2012); *see In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 68 (2d Cir. 2003); *Solomon v. Nassau Cnty.*,

---

[7]     The parties did not brief the issue whether a different standard of review is applied when a party seeks to enforce a subpoena as opposed to when a party files a motion seeking to quash a subpoena.  Because the Court does not find any difference in the relevant case law and because it is treating Precision's objections as a cross-motion to quash, the Court will apply the standards set forth in Rule 45(d) as well as the applicable law to adjudicate the instant motion.

274 F.R.D. 455, 460 (E.D.N.Y. 2011) ("Motions to quash subpoenas under the Rules are 'entrusted to the sound discretion of the district court.'") (quoting *In re Fitch, Inc*., 330 F.3d 104, 108 (2d Cir. 2003)); *Libaire v. Kaplan*, 760 F. Supp. 2d 288, 291 (E.D.N.Y. 2011) ("The decision whether to quash or modify a subpoena is committed to the sound direction of the trial court.") (citations omitted).

"The party issuing the subpoena must demonstrate that the information sought is relevant and material to the allegations and claims at issue in the proceedings." *Night Hawk Ltd. v. Briarpatch Ltd*., 03 Civ. 1382, 2003 WL 23018833, at *8 (S.D.N.Y. Dec. 23, 2003); *see also Salvatorie Studios, Int'l v. Mako's Inc*., 01 Civ. 4430, 2001 WL 913945, at *1 (S.D.N.Y. Aug. 14, 2001). Relevance in this context is subject to the over-arching relevance requirement outlined in Rule 26(b)(1). *See In re Refco Sec. Litig.*, 759 F. Supp. 2d 342, 345 (S.D.N.Y. 2011) ("Subpoenas issued under Rule 45 are subject to the relevance requirement of Rule 26(b)(1)"); *see Ford Motor Credit Co. v. Meehan*, No. CV 05-4807, 2008 WL 2746373, at *4 (E.D.N.Y. July 11, 2008); *During v. City Univ. of New York*, No. 05 Civ. 6992, 2006 WL 2192843, at *82 (S.D.N.Y. Aug. 1, 2006).

Rule 26(b)(1), as amended on December 1, 2015, recognizes that "[i]nformation is discoverable . . . if it is relevant to any party's claim or defense and is proportional to the needs of the case." Rule 26 Advisory Committee Notes to 2015 Amendments; *see Sibley v. Choice Hotels Int'l*, No. CV 14-634, 2015 WL 9413101, at *2 (E.D.N.Y. Dec. 22, 2015) (recognizing that "the current version of Rule 26 defines permissible discovery to consist of information that is, in addition to being relevant 'to any party's claim or defense,' also 'proportional to the needs of the case.'") (internal citation omitted). Notably, although Rule 26 still permits a wide range of discovery based upon relevance and proportionality, the "provision authorizing the court . . . to

order discovery of any matter relevant to the subject matter involved in the action" has been

eliminated.  Rule 26 Advisory Committee Notes to 2015 Amendments; *see Sibley*, 2015 WL

9413101, at *2 (internal citation omitted).  The rationale behind the elimination of this phrase is

the reality that it "has been used by some, incorrectly, to define the scope of discovery."  Rule 26

Advisory Committee Notes to 2015 Amendments.  Thus, Rule 26(b)(1), as amended, although

not fundamentally different in scope from the previous version "constitute[s] a reemphasis on the

importance of proportionality in discovery but not a substantive change in the law."  *Vaigasi v.*

*Solow Mgmt. Corp.*, No. 11 CIV 5088, 2016 WL 616386, at *13 (S.D.N.Y. Feb. 16, 2016); *see*

*Robertson v. People Magazine*, No. 14 Civ. 6759, 2015 WL 9077111 at *2 (S.D.N.Y. Dec. 16,

2015) ("[T]he 2015 amendment [to Rule 26] does not create a new standard; rather it serves to

exhort judges to exercise their preexisting control over discovery more exact-ingly.").

      "Once the party issuing the subpoena has demonstrated the relevance of the requested

documents, the party seeking to quash the subpoena bears the burden of demonstrating that the

subpoena is over-broad, duplicative, or unduly burdensome."  *Kingsway Fin. Servs., Inc. v.*

*Pricewaterhouse-Coopers LLP*, No. 03 Civ. 5560, 2008 WL 4452134, at *4 (S.D.N.Y. Oct. 2,

2008); *see John Wiley & Sons, Inc.*, 284 F.R.D. at 189 (burden on motion to quash is borne by

the moving party); *Ford Motor Credit Co.*, 2008 WL 2746373, at *5 ("The burden of persuasion

in a motion to quash a subpoena . . . is borne by the movant.") (citing *Sea Tow Int'l, Inc. v.*

*Pontin*, 246 F.R.D. 421, 424 (E.D.N.Y. 2007)).  In addition, where the party moving to quash is a

non-party to the pending litigation, that fact "entitles the witness to consideration regarding

expense and inconvenience."  *Night Hawk Ltd.*, 2003 WL 23018833, at *8 (internal quotations

and citation omitted); *see Cohen v. City of New York*, No. 05 Civ. 6780, 2010 WL 1837782, at *3

(S.D.N.Y. May 6, 2010) (recognizing that "special weight [should be given] to the burden on

non-parties of producing documents to parties involved in litigation"); *Corbett v. eHome Credit Corp.*, No. 10-CV-26, 2010 WL 3023870, at *3 (E.D.N.Y. Aug. 2, 2010); *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 49 (S.D.N.Y. 1996).

### B. Enforcement of the Subpoena

#### 1. Relevance

As stated above, the threshold issue the Court must address is whether Mintz Levin has established the necessary relevance with respect to the information being sought by the Subpoena issued to Precision. *See Night Hawk Ltd.*, 2003 WL 23018833, at *8 ("The party issuing the subpoena must demonstrate that the information sought is relevant and material to the allegations and claims at issue in the proceedings."); *see also Salvatorie Studios, Int'l*, 2001 WL 913945, at *1. Relevance in this context is subject to the over-arching relevance requirement set forth in Rule 26(b)(1). *See In re Refco Sec. Litig.*, 759 F. Supp. 2d at 345. As such, the subpoenaed information must be both relevant and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1); *Sibley*, 2015 WL 9413101, at *2. Once the requesting party has made a *prima facie* showing of relevance, *In re Weatherford Int'l Sec. Litig.*, 2013 WL 2355451, at *3; *Barbara*, 2013 WL 1952308, at *2, "it is up to the responding party to justify curtailing discovery." *Fireman's Fund Insurance Co. v. Great American Insurance Co. of New York*, 284 F.R.D. 132, 134 (S.D.N.Y. 2012). However, "conclusory objections as to relevance, overbreadth, or burden are insufficient to exclude discovery of requested information." *Melendez v. Greiner*, No. 01 Civ. 7888, 2003 WL 22434101, at *1 (S.D.N.Y. Oct. 23, 2003); *Trilegiant Corp. v. Sitel Corp.*, 275 F.R.D. 428, 431 (S.D.N.Y. 2011) (same); *Diaz v. Local 338 of Retail, Wholesale Dep't Store Union, United Food & Commercial Workers*, No. 13-CV-7187, 2014 WL 4384712, at *2 (E.D.N.Y. Sept. 3, 2014) (same). Rather, "[a] party resisting discovery

has the burden of showing 'specifically how, despite the broad and liberal construction afforded [by] the federal discovery rules, each [discovery request or] interrogatory is not relevant or how each question is overly broad, burdensome or oppressive . . . submitting affidavits or offering evidence revealing the nature of the burden.'" *Vidal v. Metro–North Commuter Railroad Co.*, No. 3:12CV248, 2013 WL 1310504, at *1 (D. Conn. March 28, 2013) (alteration in original) (quoting *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 42 (S.D.N.Y. 1984)); *In re Weatherford Int'l Sec. Litig.*, 2013 WL 2355451, at *4; *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 298 F.R.D. 184, 186 (S.D.N.Y. 2014); *Diaz*, 2014 WL 4384712, at *2.

In the instant case, the Subpoena seeks the production of documents and deposition testimony encompassing a universe of topics including Precision's:  (1) formation, (2) capitalization structure, (3) efforts to raise capital, (4) financial statements, (5) communications with the United States Food and Drug Administration, (6) research considered or commenced prior to the asset purchase, (7) clinical trials, (8) evaluation of Neogenix's assets, (9) knowledge concerning Neogenix's Business Advisory Board, (10) non-public documents concerning the bankruptcy case and (11) communications with any party regarding the bankruptcy case.  Bates Decl., Ex. 1 (Subpoena).  As to a timeframe, "Mintz Levin is willing . . . to limit [the Subpoena] to documents created, or concerning the period, in or before September 2012, when the Bankruptcy Court approved the asset sale."  Defendant Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.'s Memorandum of Law in Support of its Motion to Compel Compliance with Subpoena Served on Precision Biologics, Inc. ("Def.'s Mem.") [DE 165-1] at 11.

In support of its argument that the information sought is relevant, Defendant proceeds from its conclusions that: (1) "Precision Biologics is effectively Neogenix's successor;" (2)

"[t]he Neogenix bankruptcy appears to have been tactical in nature;" and (3) the asset sale was "far from an arm's-length purchase of assets" since "Neogenix stockholders were on both sides of the buy/sell transaction." *Id*. at 11.  As a result, Defendant asserts that it is "entitled to understand why Precision Biologics bought Neogenix's assets; to determine whether Precision Biologics is, in substance, merely a continuation of Neogenix's business; and to find out how Precision Biologics valued Neogenix's assets when Precision Biologics purchased them in 2012." *Id*.  Specifically, with respect to causation, Defendant contends that it is entitled to "explore whether Neogenix is an innocent victim, or whether it connived at its own liquidation, so that it could further the interests of its most influential insiders." *Id*. at 10.  In addition, Defendant states that any information concerning damages is "fully discoverable." Consequently, Defendant maintains that "[i]f (as Neogenix now says) it is entitled to damages of more than $250 million, then the relatively minimal discovery that Mintz Levin requests fully satisfies the requirement that discovery be "proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). *Id*. at 11.

In response, Precision argues that Defendant cannot meet its burden with respect to establishing relevance since its motion "only examines relevance on the last page of the argument" in which it "cites no fact to support th[e] speculation" that the asset purchase did not represent an arms-length transaction since "Neogenix stockholders were on both sides of the transaction" and because Neogenix's bankruptcy was "tactical in nature."  Precision Biologics Response to Motion to Compel Compliance with Subpoena ("Precision's Opp'n") [DE 166] at 5.[8]  Specifically, Precision attacks Defendant's argument based upon the fact that "Defendant

---

[8]      Although Precision asserts in a footnote that it initially objected to the Subpoena on the basis of defective service in addition to relevance, this issue has not been properly briefed by either party and so the Court declines to address it in the first instance.  *See id*. at 5 n. 6.

cites no document from the bankruptcy proceedings, no Neogenix document, nothing produced in discovery by anyone, no testimony of any witness at any time ever, and no law to support its speculation." *Id*. at 5-6.  In addition, Precision argues that "the value of Neogenix assets in Precision's hands now or in September 2012 has nothing to do with the damages suffered by the Plaintiff in this case, which is measured by the pre-sale value of the Neogenix assets versus what Precision paid in September 2012.  Likewise, Precision's bidding strategy, valuations and bankruptcy related documents do not alter in any way the compensation received by Neogenix shareholders. . . ." *Id*. at 6.  Moreover, to the extent Defendant seeks to establish relevance based upon a purported "loan" made to Neogenix, Precision asserts that this characterization is both "irrelevant and incorrect" since (1) "the Disclosure Statement describes not a loan by Precision, but rather a contingent payment to Precision if the litigation produces certain recovery" and (2) "the Federal Rules only allow discovery into matters relevant to claims at issue" and "[n]othing about Precision's so-called loan is at issue . . . ."  As such, according to Precision, "simply because it may be entitled to payment does not open itself to whatever discovery Defendant seeks." *Id*. at 10.[9]

---

[9]     In addition, Precision asserts that the Bankruptcy Court's findings "entered after notice, a period for objection, a hearing, and a detailed factual record" — which concluded that "'[t]he [asset sale] was negotiated at arms-length and entered into in good faith and without collusion or fraud of any kind'" — "is now *res judicata*, not subject to collateral attack and principles of claim preclusion prevent re-litigation of the issue in this Court." *Id.* at 7-8.  Although Defendant has responded to this argument in its reply, the Court declines to address it since:  (1) generally *res judicata* is asserted defensively rather than offensively as Precision is attempting to do here; and (2) perhaps more fundamentally, this non-dispositive motion presents an improper forum for raising this doctrtine since *res judicata* may only be interposed during dispositve motion practice.  *See Sassower v. Abrams*, 833 F. Supp. 253, 264 n. 18 (S.D.N.Y. 1993) ("[T]he defense of res judicata or collateral estoppel may be brought, under appropriate circumstances, either via a motion to dismiss or a motion for summary judgment"); *Caldwell v. Gutman, Mintz, Baker & Sonnenfeldt, P.C.*, 701 F. Supp. 2d 340, 349 (E.D.N.Y. 2010) ("A court may dismiss a claim on *res judicata* or collateral estoppel grounds on a motion to dismiss, a motion for judgment on the pleadings, or a motion for summary judgment.").

In its reply, Defendant argues that "Precision's view of Neogenix's damages claim, the 'pre-sale value of the Neogenix assets' and 'what Precision paid' both depend on the subject about which Precision is resisting discovery—'the value of the Neogenix assets in Precision's hands' at the time of the bankruptcy sale." Defendant Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.'s Reply Memorandum of Law in Further Support of its Motion to Compel Compliance with Subpoena Served on Precision Biologics, Inc. ("Def.'s Reply.") [DE 168] at 2. Based on this contention, Defendant argues that: (1) "Precision's valuations of Neogenix assets at the time of the bankruptcy are relevant to Neogenix's claim in this case" since "such valuations were made contemporaneous[ly], or nearly so, with the alleged loss;" and (2) the value of the Precision shares included in the asset purchase "necessarily depended on the value of the Neogenix assets that Precision would then own. So the value of the Neogenix assets in Precision's hands was reflected in 'what Precision paid,' and thus (even in Precision's view) bears on Neogenix's claim of damages for this separate reason." *Id.* at 2-3.

Prior to addressing the contours of the Subpoena itself, the Court must first determine whether Defendant (as the movant) has established that the discovery it seeks is both relevant and proportional in accordance with Rule 26's over-arching relevancy requirement. *See In re Refco Sec. Litig.*, 759 F. Supp. 2d at 345; *Sibley*, 2015 WL 9413101, at *2. In order to establish the necessary relevance element, a party must do more than offer mere speculation or conjecture. *See Surles v. Air France*, No. 00 CIV 5004, 2001 WL 815522, at *4 (S.D.N.Y. July 19, 2001), *aff'd*, No., 2001 WL 1142231 (S.D.N.Y. Sept. 27, 2001) ("discovery requests [can]not be based on pure speculation or conjecture."); *Tottenham v. Trans World Gaming Corp.*, No. 00 CIV. 7697, 2002 WL 1967023, at *2 (S.D.N.Y. June 21, 2002) (same); *Lemanik, S.A. v. McKinley Allsopp, Inc.*, 125 F.R.D. 602, 610 (S.D.N.Y. 1989) (denying discovery requests based on

speculation).  Indeed, "courts faced with such requests [ ] routinely decline to authorize fishing expeditions."  *Surles*, 2001 WL 815522, at *4; *Tottenham*, 2002 WL 1967023, at *2 ("Discovery, however, is not intended to be a fishing expedition, but rather is meant to allow the parties to flesh out allegations for which they initially have at least a modicum of objective support."); *see also McBeth v. Porges*, 171 F. Supp. 3d 216, 236 (S.D.N.Y. 2016) ("[T]he Federal Rules of Civil Procedure do not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions or speculation"); *287 Franklin Ave. Residents' Ass'n v. Meisels*, No. 11-CV-976, 2012 WL 1899222, at *6 (E.D.N.Y. May 24, 2012) ("Discovery is not to be used as 'a hunting license to conjure up a claim that does not exist.'") (quoting *Palumbo v. Shulman*, No. 97 Civ. 4314, 1998 WL 436367 (S.D.N.Y. July 24, 1998)).

In the instant case, Defendant's motion primarily relies upon unsupported assertions amounting to little more than speculation and conjecture.  For example, Defendant asserts that "Precision Biologics is effectively Neogenix's successor," that the asset sale "was far from an arm's length purchase" and that "Precision Biologics is, in substance, merely a continuation of Neogenix's business."  Def.'s Opp'n at 11.  Based upon these statements, Defendant concludes that it is "entitled to understand why Precision Biologics bought Neogenix's assets; to determine whether Precision Biologics is, in substance, merely a continuation of Neogenix's business; and to find out how Precision Biologics valued Neogenix's assets when Precision Biologics purchased them in 2012."  *Id*.  The problem with Defendant's proffer is that it fails to cite any evidence or concrete facts which would provide even elementary support for the assertions it makes and the broad swath of discovery it seeks to obtain via the Subpoena.  Such substantiation is even more important, where, as here, Defendant seeks a broad universe of discovery as well as deposition testimony from a non-party to this lawsuit.  *See Crosby v. City of N.Y.*, 269 F.R.D.

267, 282 (S.D.N.Y. 2010) ("Where a party has Subpoenaed a non-party, [t]he party issuing the subpoena *must* demonstrate that the information sought is relevant and material to the allegations and claims at issue in the proceedings.") (internal quotations and citation omitted) (emphasis added); *see also Jones v. Hirschfeld*, 219 F.R.D. 71, 74 (S.D.N.Y. 2003) (recognizing that Rule 45 of the Federal Rules of Civil Procedure "provides additional protection for non-parties subject to a subpoena by mandating that a court quash or modify the subpoena if it . . . subjects [the] person to undue burden.").  Indeed, of the twelve pages of Defendant's memorandum of law, only four pages are devoted to argument, which, other than citing general propositions concerning relevance, cite no facts, evidence or case law supporting Defendant's contention that the discovery sought here is relevant and otherwise proportional in light of the claims and the parties involved in this action.[10]  In short, Defendant's entire premise rests upon nothing more than an *ipse dixit* (*i.e.*, that there is a factual basis for the statements made based solely upon Defendant's assertions of their existence).  However, such statements, without more, do not meet Defendant's burden under Rule 26.  *See 287 Franklin Ave. Residents' Ass'n v. Meisels*, No. 11-CV-976, 2012 WL 1899222, at *6 ("Sasmor has not met his burden of making a *prima facie* showing that the discovery sought is relevant.  Plaintiffs' allegation that '[d]efendants *may* operate an additional fraudulent scheme' involving property that defendants '*may* have been attempting to purchase through a short sale,' provides an insufficient basis on which to support what appears to be a fishing expedition.  Given the clearly speculative nature of the allegations, Sasmor may not 'use discovery to uncover evidence that might support an as yet unasserted ...

---

[10]      The Court acknowledges that Defendant also included a chart in its memorandum which set forth its position concerning each category of discovery being sought.  However, similar to the main body of its argument, Defendant cites no case law, evidence or other concrete support which could provide a sound basis for the discovery it seeks to obtain from Precision via the Subpoena.

claim.'") (internal citation omitted); *In re Rockefeller Ctr. Properties*, No. 00 CIV. 647, 2002 WL 22051, at *9 (S.D.N.Y. Jan. 8, 2002) ("Chase is speculating that further discovery will reveal evidence of mistakes or errors in the calculation of the Additional Rent. Such conjecture is not enough to grant discovery.").

Apart from the lack of factual or evidentiary support, Defendant's premise and the conclusions drawn from it are also at odds with the findings reached by the Bankruptcy Court which approved the asset purchase between Neogenix and Precision. *See generally* Bates Decl., Ex. 10. For example, notwithstanding Defendant's unsupported assertions to the contrary, the Bankruptcy Court specifically found that (1) Precision "is *not* a mere continuation of [Neogenix] or its estate;" (2) Precision "does *not* constitute a successor to [Neogenix] or its estate;" and (3) "The [Asset Purchase] Agreement *was negotiated at arm's length* and entered into in good faith and without collusion or fraud of any kind. [Precision] has not engaged in collusion or any conduct that would otherwise control or tend to control the sale price as between or among potential bidders and, therefore, has not violated section 363(n) of the Bankruptcy Code." Bates Decl., Ex. 10 at 6-7, 11 (emphasis added). In light of the Bankruptcy Court's conclusions, and without any independent factual or evidentiary basis proffered by Defendant, it is difficult for this Court to reconcile Defendant's statements (based upon conjecture) in the face of the Bankruptcy's Court's factual and legal conclusions to the contrary. To be sure, to the extent Defendant disagreed with the factual findings and legal conclusions reached by the Bankruptcy Court, a timely appeal must have been brought before the District Court for the District of Maryland. *See* 28 U.S.C. § 158(a)(vesting appellate jurisdiction in the district courts); *Bordonaro v. Fido's Fences, Inc.*, No. 16-CV-414, 2017 WL 243368, at *4 (E.D.N.Y. Jan. 20, 2017) ("recognizing that 28 U.S.C. § 158(a), [ ] provides that '[t]he district courts of the United

States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees; . . . [and] with leave of the court, from other interlocutory orders and decrees . . . of bankruptcy judges.'") (quoting 28 U.S.C. § 158(a)(1), (3)).  As such, the Court must give effect to the findings and conclusions reached by the Bankruptcy Court concerning the facts and circumstances surrounding the asset purchase unless and until the Bankruptcy Court's decision is modified or otherwise overturned on appeal in the District Court.[11]  However, based upon the parties' submissions, it does not appear that a timely appeal was ever filed.  Further, neither party has provided — nor is the Court aware — of any binding or persuasive authority standing for the proposition that the Court may disregard a Bankruptcy Court's factual findings and legal conclusions under the facts presented here.

Here, Defendant included the Bankruptcy Court's Order as part of its motion papers and the Court finds that the factual and legal conclusions entered by the Bankruptcy Court bear directly on Defendant's argument as to whether it should be permitted to "explore whether Neogenix is an innocent victim, or whether it connived at its own liquidation, so that it could further the interests of its most influential insiders."  Def.'s Opp'n at 10.  Specifically, the Bankruptcy Court's findings belie any notion of such "conniving."  Further, similar to its other assertions, Defendant offers no independent corroboration of its suppositions that would either call into question the Bankruptcy Court's conclusions or otherwise provide a sound basis for the broad non-party discovery it now seeks.  Put another way, the mere specter of wrongdoing on the part of Neogenix or Precision in conjunction with the asset sale cannot itself suffice to "conjure

_____

[11]   To the extent Defendant asserts that it is not bound by the Bankruptcy Court's findings since it never appeared in that action, Def.'s Reply at 3, the Court will not address this argument for the same reasons it declined to consider Precision's argument to the contrary based upon principles of *res judicata*.  *See supra* note 9.

up a claim that does not exist." *287 Franklin Ave. Residents' Ass'n*, 2012 WL 1899222, at *6.

Rather, Defendant must come forward with facts or other concrete evidence that could provide

the Court with a good faith basis to infer or conclude that despite the Bankruptcy Court's

findings, there is reason to believe that something is amiss. *See, e.g.*, Bates Decl., Ex. 10 at 6

(finding Neogenix complied in good faith with all bid procedures); at 13 (finding both the sale

and the consideration provided to be "fair and reasonable and shall be deemed for all purposes to

constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy

Code and any other applicable law"). However, such facts and evidence are lacking here.

  In short, to the extent Defendant seeks to impugn the findings of the Bankruptcy Court

concerning facts and/or conclusions surrounding the asset purchase and sale — which bear

directly on the instant motion — it must make a sufficient factual showing to permit the Court to

draw the inference that notwithstanding the Bankruptcy Court's findings, the information

Defendant seeks is grounded upon some modicum of objective support such that the intrusion

into Precision's affairs amounts to more than a mere fishing expedition or rummaging through

documents of a non-party to this suit. *See Tottenham*, 2002 WL 1967023, at *2 ("Discovery,

however, is not intended to be a fishing expedition, but rather is meant to allow the parties to

flesh out allegations for which they initially have at least a modicum of objective support."); *see

also McBeth*, 171 F. Supp. 3d at 236 ("[T]he Federal Rules of Civil Procedure do not unlock the

doors of discovery for a plaintiff armed with nothing more than conclusions or speculation").[12]

---

[12] The Court notes that to extent the Subpoena sought information relating to Precision's assets, *see* Bates Decl., Ex. 1 (seeking Precision's financial statements), such a demand is improper on the independent grounds that (1) discovery targeted at a non-party is generally only permitted in a post-judgment context pursuant to Rule 69 and serves to assist the judgment creditor in its efforts to enforce a judgment against the judgment debtor. *See Universitas Education, LLC v. Nova Group, Inc.*, Nos. 11 Civ. 1590, 11 Civ. 8726, 2013 WL 3328746, at *3-4 (S.D.N.Y. July 2, 2013); *Vazquez v. Ranieri Cheese Corp.*, No. CV-07-464, 2013 WL 101579,

Here, Defendant has put forth nothing more than conjecture and supposition to support its request. Such speculation, however, is insufficient to meet its burden under Rule 26. In light of this finding, the Court declines to address the contours of the Subpoena itself.

## IV. CONCLUSION

Based upon the foregoing analysis, Defendant's motion to compel enforcement of the Subpoena served upon non-party Precision is DENIED.

**SO ORDERED.**

Dated: Central Islip, New York
       March 31, 2017

/s/ A. Kathleen Tomlinson
A. KATHLEEN TOMLINSON
United States Magistrate Judge

---

at *2 (E.D.N.Y. Jan. 8, 2013); and (2) "a non-party's own assets are not automatically a proper subject of inquiry[.]" *Vazquez*, 2013 WL 101579, at *2; *see Universitas Education, LLC*, 2013 WL 3328746, at *4 ("Generally, nonparties may only be examined about the assets of a judgment debtor[.]") (internal quotations and citation omitted); *Jacobson v. Moller & Moller, Inc.*, No. CV 2002-6316, 2007 WL 1989260, at *1 (recognizing that generally "discovery is permitted against a non-party to discover facts relating to the assets of the judgment debtor").